MUNICIPAL TRUST CO., Limited, v. JOHNSON CITY.

(Circuit Court of Appeals, Sixth Circuit.   June 3, 1902.)

No. 1,082.

**1. RAILROADS—MUNICIPAL SUBSCRIPTION TO STOCK—VALIDITY OF BONDS.**

A railroad company was organized under the general statutes of Tennessee to build a railroad between a point on the eastern boundary and one on the northern boundary of the state, and having the same name as a consolidated company, existing under the laws of South Carolina and North Carolina, authorized to build and operate a road through those states and to a point on the Ohio river.   The two companies were consolidated, as permitted by the laws of Tennessee, and the consolidation was ratified by the stockholders of each, which under the statute of Tennessee gave the consolidated company power to do "all acts and things which the said companies so consolidating, or either of them, might have done previous to such consolidation."   After such ratification an application was made in the name of the company, in which it was described as being "chartered under the laws of the state of Tennessee," asking a city in that state to subscribe to its capital stock as authorized by Shannon's Ann. Code Tenn. §§ 1558–1573, which conferred such authority only in case of companies incorporated under the general laws of the state.   The subscription was made as authorized by a vote of the citizens, the road constructed, and bonds issued and delivered to the company in payment of the subscription.   The incorporators of the Tennessee company resided in such city, which was named in its charter as a point on its projected road, and its articles of incorporation were there registered in the office of the county clerk.   The stockholders' meetings at which the consolidation was effected were also both held there.   *Held*, in an action to enforce the collection of coupons from the bonds, that under such evidence it could not be declared by the court as conclusively proven that the town, in the issuance of the bonds, was dealing with the foreign corporation, rather than with the domestic or consolidated company, and that the bonds were therefore unauthorized and void, although the application to the city was signed by one as general manager, who, previous to the consolidation, had been the general manager of the foreign corporation.

**2. SAME—EFFECT OF RECITALS IN BONDS—TENNESSEE STATUTE.**

Shannon's Ann. Code Tenn. § 1558 et seq., which authorizes cities and towns to subscribe to the stock of a domestic railroad company under certain conditions, and to issue bonds in payment therefor, provides (section 1562) that, upon the presentation of an application for such subscription to the mayor, he shall convene the board of mayor and aldermen, or other governing body, and that, "should a majority of the board of mayor and aldermen, or other governing or representative body, of such city or town, be of the opinion that an election should be held in the same to determine whether or not such city or town should make the subscription, it shall so order."   *Held*, that such statute vested in the board of mayor and aldermen the power and duty to determine whether a railroad company making application for such a subscription was a domestic corporation, to whose stock a subscription might lawfully be made; that where it acted, and called an election, and pursuant to the vote thereat issued the bonds to the company on a compliance with the required conditions, which bonds recited their issuance under such statute, and that "in issuing the same all of the provisions and requirements of each of said statutes have been strictly fulfilled and complied with," the municipality was precluded by such recitals from denying that the company was a domestic corporation, in a suit by a bona fide holder of such bonds, where a domestic corporation of the name existed, and its articles of incorporation were of record, in the county where the bonds were issued.

**8. SAME.**

Under a statute limiting the amount of railroad bonds which may be issued by a city to a certain per cent. of its "taxable property," the assessment rolls for the year preceding that in which bonds are issued are not conclusive upon the value of the taxable property of the city at the time of their issuance, and a recital in the bonds, by the officers vested with the duty of determining the question, that the statute has been fully complied with, is conclusive upon the city, in favor of a bona fide holder, that they do not exceed in amount the statutory limit.

In Error to the Circuit Court of the United States for the Eastern District of Tennessee.

This is a suit brought in the court below to recover the contents of certain coupons for interest belonging to bonds issued by the mayor and aldermen of Johnson City, a municipality of Tennessee, and bearing date May 1, 1890. The bonds were executed and delivered to the Charleston, Cincinnati & Chicago Railroad Company in payment of a subscription by the city for the stock of the railroad company at par, under the authority of a statute of Tennessee found in Shannon's Ann. Code, §§ 1558–1573, inclusive, of which the following are all that need be quoted:

"Sec. 1558. Any county, incorporated city, or town may become a stock-holder in any railroad company incorporated under the general laws of this state, to an amount not exceeding, in the aggregate, one-tenth of its taxable property, by complying with the requirements of the following sections of this chapter:

"Sec. 1560. Before any county shall make any subscription under the provisions of said sections, the president, or other authorized officer or agent of the railroad company, shall submit to the chairman or judge of the county court, as the case may be, of the county an application in the name of the company, setting forth the proposed termini of its railroad, the amount of the subscription asked for, the time within which its road will be constructed through the county, and that the application is made under said sections, and the same shall be accompanied by a plan or map, certified by the chief engineer of [the] company, showing the general direction and line of its railroad in the county. And, before any incorporated city or town shall make any subscription under these provisions, such application must be submitted to its mayor or chief executive officer, showing the proposed termini of its railroad, accompanied with the declaration, on the part of the company, that it will locate and construct its railroad within one mile of such incorporated city or town, within such time as shall be fixed in the application.

"Sec. 1562. And in like manner [that is, referring to section 1561, relating to counties], upon the presentation of the application to the mayor or other chief executive officer of any incorporated city or town, accompanied with a declaration on the part of the company that its line of railroad shall be located and constructed within one mile of such city or town, as provided in section 1560, then it is made the duty of such mayor or chief executive officer to convene the board of mayor and aldermen, or other governing or representative body of such city or town, and submit such application for its consideration; and should a majority of the board of mayor and aldermen, or other governing or representative body of such city or town, be of the opinion that an election should be held in the same to determine whether or not such city or town should make the subscription, it shall so order.

"Sec. 1563. The county court, or board of mayor and aldermen, or other governing body, as the case may be, shall spread upon its records the application and accompanying plan or map or declaration, as the case may be, and the amount to be voted upon by the people, and shall have full power to order such elections according to the laws regulating elections in this state.

"Sec. 1569. Such subscription of any county or incorporated city or town shall not become due and payable unless said railroad company shall have constructed and put in operation within the time fixed in the application, and substantially in the direction and on the line as shown in said plan or map,

that portion of its railroad located within the county making the subscription, or that portion of its railroad located within the county in which is situated the incorporated city or town making the subscription, as the case may be: provided, that any county, incorporated city, or town making the subscription under these provisions, may, in addition to the restrictions imposed by this section, stipulate with the railroad company that its subscription shall not become due and payable until the company shall construct its road to such points, or for such distances, as may be agreed upon.

"Sec. 1570. When such subscriptions shall become due and payable, as provided in section 1569, the county or city or town making the subscription shall make and execute its coupon bonds for the amount of such subscription, payable not more than twenty years after date, and bearing interest at such rate as may be agreed upon, not exceeding 6 per cent. per annum, payable semiannually, and deliver the same to the railroad company: provided, that such county, city, or town may pay such subscription in cash at maturity, if it shall so elect."

In pursuance of these provisions, the Charleston, Cincinnati & Chicago Railroad Company on December 30, 1889, made an application for aid by way of subscription to its stock to the amount of $75,000 to the mayor and aldermen of Johnson City, the initial part of said application being as follows:

"Johnson City, Tennessee, Dec. 30, 1889.

"To the Board of Mayor and Aldermen of Johnson City, Tennessee: The undersigned, Charleston, Cincinnati and Chicago Railroad Company, a body politic and corporate, chartered under the laws of the state of Tennessee, submits the following application for aid from the town of Johnson City, under the Acts of the General Assembly of Tennessee, chapter 3, page 57, and chapter 58, page 129, of the Acts of 1887: The said railroad company proposes to construct a line of railroad, standard gauge, from Charleston, in the state of South Carolina, to Ashland, in the state of Kentucky, and has located and is constructing its line of railroad through the corporate limits of the town of Johnson City, and will complete that portion of its line within said town and county on or before the 30th day of April, 1890. The undersigned Charleston, Cincinnati and Chicago Railroad Company respectfully asks the subscription of seventy-five thousand dollars ($75,000) from the town of Johnson City, Tennessee, to the capital stock of said railroad company," etc.

The application proceeded to state the matters required by the statute and was signed as follows: "Charleston, Cincinnati & Chicago Railroad Co., by R. A. Johnson, General Manager." It was submitted to the mayor, who in turn submitted it to the board. Together therewith the railroad company made a written proposition to build a station house within the city at a place designated. "Upon due consideration," as its record states, the board was unanimously of opinion that an election should be held to determine whether the proposed subscription should be made. An election was duly held, and out of a total of 429 votes 422 were in favor of the proposition. Bonds with interest coupons were prepared and signed by the proper city officials, and deposited with a bank to be held in escrow until the railroad company should have performed its part of the agreement. Thereafter, on May 1, 1890, the mayor filed with the bank the following certificate:

"Johnson City, Tenn., May 1, 1890.

"To the First National Bank of Johnson City, Tenn.: This certificate certifies that the Charleston, Cincinnati & Chicago Railroad Company has fully complied with its part of the contract or undertaking as embodied in its proposition, dated December 30, 1889, and submitted to the legal voters of said Johnson City on the 30th day of January, 1890, whereby said citizens voted a subscription of seventy-five thousand ($75,000.00) dollars to the capital stock of said railroad company payable in the bonds of said Johnson City, which said bonds have been placed in escrow with you in accordance with the terms of a certain indenture of trust, dated Feb. 1, 1890, and you are authorized to deliver the said bonds to said railroad company accordingly.

"Ike T. Jobe, Mayor of Johnson City, Tenn."

The stock subscribed for was delivered to the city, and the bonds were delivered to the railroad company. The bonds and coupons were in the form following, except with regard to their number and dates of maturity:

"United States of America, State of Tennessee, County of Washington, Corporation of Johnson City.

"Know all men by these presents, that the corporation of Johnson City, in the county of Washington, state of Tennessee, acknowledges itself indebted and firmly bound to the Charleston, Cincinnati and Chicago Railroad Company, or bearer, in the sum of one thousand dollars, lawful money of the United States of America, and for value received hereby promises to pay to said company, or bearer, said sum of one thousand dollars, at the National Bank of Deposit, in the city of New York, state of New York, in twenty years after date, with interest thereon from date thereof at the rate of 6 per centum per annum, payable semiannually on the first day of May and November in each and every year, on presentation and delivery of coupons hereto annexed and duly signed by the recorder of Johnson City, for the performance of all which the taxable property of said Johnson City is irrevocably pledged, pursuant to an act of the general assembly of the state of Tennessee, entitled 'An act to enable the counties and incorporated cities and towns to subscribe to the capital stock of any railroad company incorporated under the general laws of this state in the mode prescribed therein, and to provide for the payment of such subscription,' approved February 17, 1887, and also an act passed February 28, 1887, approved March 2, 1887, authorizing Johnson City to issue bonds to an amount not exceeding seventy-five thousand dollars. This bond is one of a series of seventy-five bonds of like tenor, date, and amount herewith, issued by virtue of said above named statutes, and in issuing the same all of the provisions and requirements of each of said statutes have been strictly fulfilled and complied with.

"In witness whereof, the mayor and the recorder of the corporation of Johnson City, Tennessee, have hereunto signed their names, and the same has been countersigned by the board of trustees of the sinking fund of said town, at said Johnson City, on the first day of May, A. D. 1890.

"Ike T. Jobe, Mayor.
"George P. Crouch, Recorder.

"G. Kirkpatrick,
"J. W. Hunter,
"J. E. Crandall,
     "Board of Trustees of the Sinking Fund."

(Form of Coupon.)

"$30.                      State of Tennessee.                      $30.

"County of Washington, Johnson City.

"The corporation of Johnson City will pay to the Charleston, Cincinnati and Chicago Railroad Company, or bearer, thirty dollars, at the National Bank of Deposit, in the city of New York, in the state of New York, on the first day of May, 1910, the same being the semiannual interest then falling due on bond.

"George P. Crouch, Recorder.                      No. 64."

It was stipulated by the attorneys for defendant that before the coupons sued upon in the above-entitled action became due and payable, or before the bonds of which they formed a part became due and payable, the plaintiff became the owner and holder of said coupons and bonds for value without notice of any infirmity in said bonds or coupons, except such notice, if any, as it was chargeable with from the face of the bonds. To a declaration counting upon a large number of the coupons taken from the bonds above mentioned the defendant set up two defenses: First, that the railroad company for whose stock the defendant's subscription was made was not a company incorporated under the laws of Tennessee, but was a corporation incorporated under the laws of North Carolina and of South Carolina, and therefore that the bonds and coupons were executed without authority; and, second, that the value of the taxable property in the city was less than

$750,000 at the time when the subscription of $75,000 was voted, and therefore the latter was in excess of the 10 per cent. statutory limitation, and that the bonds and coupons were for that reason void. The plaintiff contended that in the face of the recitals of the bonds neither of these defenses was open to the defendant. In support of them the defendant was allowed, against the objection of the plaintiff, to go into evidence. From the record it appears that the facts upon which the first ground of defense rested were in substance these: For some time previous to the transaction in question there had existed a consolidated corporation of the name of the "Charleston, Cincinnati & Chicago Railroad Company," made up of constituents organized under the laws of North Carolina and South Carolina, respectively, and consolidated by the sanction of the legislatures of those states; and the faculty was expressly granted by the acts confirming the consolidation to extend its line northward through the states of Tennessee, Virginia, and Kentucky to the Ohio river. In Tennessee, also, there had been granted some years before a special charter to another company bearing the same name, but which was admittedly void by reason of a constitutional inhibition of the state against special acts of incorporation. About the time when the first-mentioned consolidated company was preparing to extend its line into Tennessee, another railroad corporation having the same name was organized in Tennessee under the general laws of that state, with a charter containing the usual powers, having for its professed object the building and operation of a railroad from a point on the state line of North Carolina through or across the state of Tennessee, by or near Johnson City, to some point on the state line of Virginia in Sullivan county. The incorporation of this company was completed by the acknowledgment of the incorporators and the filing for registration of its articles in the register's office of Washington county and in the office of the secretary of state. The certificate of registration in the register's office bears date November 9, 1889, and the certificate of registration in the office of the secretary of state, November 13, 1889. On November 19, 1889, articles of agreement for the consolidation of this last-named Tennessee company and the consolidated company of the Carolinas were entered into by their respective boards of directors, and these articles were duly approved by the stockholders of the Tennessee company on the same day, and by the stockholders of the consolidated company of the Carolinas on December 2, 1889. The articles of consolidation were filed in the office of the secretary of state for Tennessee May 15, 1890. From these articles it appears that at the date thereof R. A. Johnson, who as general manager subsequently signed the application to the mayor and aldermen of Johnson City for its aid by stock subscription, was the general manager of the Carolina company. The evidence tends to show that, after the consolidation agreement had been ratified by the stockholders of both the constituent companies, the new company proceeded with the construction of its line in Tennessee, and built it through Johnson City, and otherwise fulfilled the conditions on which the subscription of the city to the stock became effectual, and the payment therefor became due. Relative to the question whether the issue of bonds exceeded the limitation of the statute, it was shown that from a copy of the assessment roll of the taxable property in the city, and from a copy of the assessment of railroad and telegraph property in the city from the state comptroller's office, the total for the year 1889 was somewhat less than $750,000, but just how much less does not very clearly appear. There was no evidence of the assessment made in 1890. The trial judge, upon the conclusion of the evidence, declined a request to instruct the jury to render a verdict for the plaintiff, and instructed that a verdict should be rendered for the defendant, upon the ground that, as he thought, the evidence clearly showed that the stock subscribed for by the city was that of the consolidated corporation of North Carolina and of South Carolina, and was not that of a corporation organized under the laws of Tennessee. That view being deemed fatal to the plaintiff's right of recovery, no opinion was expressed upon the subject of the other ground of defense, namely, that the issue of bonds was in excess of the limitation prescribed by the statute. The verdict and judgment having been entered for the defendant, the plaintiff sued out a writ of error.

W. H. Rossington, Charles Blood Smith, and Clifford Histed (Horace B. Hord, of counsel), for plaintiff in error.
Burrow Bros. and Isaac Harr, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having stated the case as above, delivered the opinion of the court.

A preliminary question in respect to the transcript is raised by the defendant in error, which should be first disposed of. It is urged that so much of the transcript as sets forth the consolidation of the Tennessee corporation with the consolidated company of the Carolinas is no part of the bill of exceptions, and was copied into it by mistake of the clerk, and a letter from him to the clerk of this court so states. But we think that the letter is founded on a misapprehension, and that the bill of exceptions fairly shows that the consolidation papers were put in evidence on the trial. In the body of the bill of exceptions there appears a stipulation relative to this subject, which reads as follows:

"It is hereby stipulated and agreed by and between the parties hereto that the certified copies of charters, admitted in evidence of the suit of Municipal Trust Company, Limited, v. Unicoi county, are admissible in evidence in this suit in so far as they are pertinent thereto.

"Horace B. Hord, for Plaintiff.
"Robt. Burrow.
"Isaac Harr.

"Sept. 13, 1901."

And it is further stated that "the plaintiff introduced the following papers," among which were "stipulations as to the introduction of charters of the C., C. & C. R. R. Co.," and there is the further direction, "(Here copy all of said papers in the order named)." The copy of the articles of consolidation in question bear the filing of the clerk of the United States court under the title of "Mercantile Trust Company v. Unicoi County," and there is no doubt that it is one of the papers called "charters" in the above-mentioned stipulation. We think the fair inference is that the papers in question were understood to be in evidence, and that the construction of the bill of exceptions by counsel is over nice. Other documents appear in the bill of exceptions with no better warrant, about which no question is made.

We are of opinion that there was error in the ruling of the circuit court that it was clearly apparent that the railroad company for whose stock the defendant subscribed was the foreign company, existing solely by virtue of the laws of the states of North Carolina and of South Carolina, and that therefore the plaintiff could not recover. Assuming, for the present, that this question was not concluded by the recitals in the bonds, we think the evidence tended strongly to show, not that it was the foreign corporation with which the city was dealing, but that it was either the Tennessee constituent of the newly consolidated company or the consolidated company itself, most probably the latter. The principal difficulty arises from the identity of the names of the corporations. The reasons for thinking that it

was a Tennessee company, rather than a foreign one, are many. To begin with, there is a legal presumption that the officials of the city did not intend to violate their duty by disregarding the statutory condition,—a condition to which their attention was expressly invited by the language of the application made to them; and this presumption ought to prevail if the language, read in the light of the circumstances, is susceptible of that construction. There was no object to be gained by transgressing the law. They were doubtless aware that the Tennessee company had been organized; for it had been recently done, and its articles filed in the register's office in their own city, and its declared purpose was to build a railway "by or near Johnson City." It would seem more than probable that they were also aware of the proceedings for the consolidation of the companies; for the stockholders' meeting at which the consolidation was confirmed was held there, and the directors of the Tennessee constituent were all residents of that place. Moreover, Johnson City seems to have been the center of the enterprise in that locality. The applicant describes itself in the application as a corporation organized "under the laws of Tennessee," and asks for aid "under the acts of the general assembly of the state of Tennessee"; referring to the act of 1887, which contained the provisions above quoted and limited the right to obtain aid to corporations organized under the laws of Tennessee.

The principal reasons urged in support of the theory that the application was made by and granted to the foreign company consist of these circumstances: The application states that the "said railroad company proposes to construct a line of railroad, standard gauge, from Charleston, in the state of South Carolina, to Ashland, in the state of Kentucky," whereas the line of the Tennessee company was by its charter defined as extending across the state of Tennessee, with certain named termini on its borders. But the acts of the Carolinas, ratifying the organization of that company by consolidation, plainly import that the extension of the line through the other states might be done by consolidating with other railroad companies in those states; and it is perfectly clear that this was the program, and that the very purpose of the organization of the Tennessee company was that it should be consolidated with the Carolina company, to the end that there should be a corporation organized under the laws of Tennessee and having the status of a domestic corporation in that state for building and operating the road through its domain. It was, therefore, quite as appropriate that, if the applicant was the Tennessee company, having already practically effected a consolidation with the Carolina company, and thereby acquired a common object and purpose with it, it should have thus described its purpose in its application, as that the other constituent should have done so. Again, it is urged as a decisive fact that R. A. Johnson, who as general manager signed the application, was not at any time the manager of the Tennessee company (meaning the company which consolidated with the Carolina company), but was the general manager of the Carolina company. It appears that at the date of the consolidation he was acting in the latter capacity. It is consistent

with that, and, in fact, seems rather probable, from the status and relations of the consolidating companies, that he should have continued in that office with the companies which were consolidating; his charge being expanded by that transaction. Thus, when all the facts are seen, his signing the application as general manager of the Charleston, Cincinnati & Chicago Railroad Company has no special significance in its bearing upon the question as to what company he was representing. Until its merger, the Tennessee company was competent to obtain the aid. After the merger, the new consolidated company was competent to obtain it; for it became a company organized under the laws of Tennessee. By sections 1522, 1523, 1524, and 1525 of Shannon's Code the consolidation was authorized. The two last-mentioned sections read as follows:

"Sec. 1524. The consolidation shall not have effect until the terms and conditions of the agreement shall have been approved by a majority of the stockholders of each of the consolidating companies, at a regular annual meeting.

"Sec. 1525. The agreement, together with the evidence of the stockholders' approval, shall be filed and recorded in the office of the secretary of state."

From these provisions it would appear that the consolidation had already become effective at the time when the application for aid was made, although for some purposes it may not have been complete until the filing of the agreement, with evidence of the stockholders' approval, in the office of the secretary of state on May 15, 1890. But at all events there was continuously, during the whole transaction in question, a Tennessee corporation existing, either in its original character or with its accretion of the Carolina company. Section 1527 is as follows:

"The corporation formed by the consolidation of two or more railroad corporations shall have, possess, and exercise all the rights, powers, privileges, immunities, and franchises, and be subject to all the duties and obligations, not inconsistent with the provisions of this article, conferred and imposed by the laws of this state upon such companies so consolidating, or either of them."

Section 1528 provides:

"It shall have power: * * * (6) And to do all other acts and things which the said companies so consolidating, or either of them, might have done previous to such consolidation."

For these reasons we think the jury would have been fully warranted in finding that the application was made for and by a corporation organized under the laws of Tennessee by way of subscription to its stock, and that it was so understood by those representing the city. It is pressed upon us that the supreme court of Tennessee decided otherwise in a former suit (Johnson City v. Charleston, C. & C. R. Co., 100 Tenn. 140, 44 S. W. 670), brought by the city against the railroad company and some of the holders of the bonds issued, to impeach the bonds and procure their cancellation. But that decision was made since the bonds were issued, and we are bound to exercise our own judgment, notwithstanding the respect which we acknowledge to owe to the supreme court of the state. Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 334, 76 Fed. 296; Jones v. Hotel Co., 30 C. C. A. 108, 86 Fed. 370. It is to be

116 F.—30

observed, however, that that court did not and could not pass upon the question whether the corporation aided was one organized under the laws of Tennessee, or was a foreign corporation. That question was regarded as one of fact, which had been settled by the decision of the lower court, and under the law of Tennessee its finding was conclusive.

The views we have indicated, upon the assumption taken that the question we have discussed was not concluded by the recital in the bonds, would lead to a reversal of the judgment; but, inasmuch as the question of the proper consequence of these recitals will arise upon the new trial to be granted, it seems expedient to express our judgment upon that further question. The recitals are, in substance, as strong as language could make them, and do undoubtedly extend, as the supreme court of Tennessee in the case referred to admitted, to an affirmation that the company for whose stock the bonds were voted and issued was a corporation organized under the laws of Tennessee; for, as is shown by cases of the highest authority, general recitals covering particular facts have the like effect as the special enumeration of them. In Marcy v. Oswego, 92 U. S. 637, 23 L. Ed. 748, and Humboldt Tp. v. Long, 92 U. S. 642, 23 L. Ed. 752, the recitals did not specially refer to the facts on which the estoppel arose. The decisive inquiry, therefore, is whether the ascertainment and determination of that fact was devolved upon the board of mayor and aldermen, to be made upon any application for aid which should be made to it under the statute; for if the fact was entirely extrinsic to the duty of the board, and was intended to remain in all circumstances a matter of fact unaffected by any determination which the board might make, then the recitals are of no avail so far as that question is concerned, and the matter would be left to be ultimately tested whenever the question should arise. On the other hand, if the proper construction of the act is that the legislature intended that, when the board should be required to act upon an application submitted to it, it should inquire and determine, as one of the bases upon which it would proceed, whether the applicant was such a corporation as the statute intended, then the recitals would undoubtedly conclude that fact, and, upon the admission that the plaintiff is a bona fide holder of the coupons for value, it would be entitled to recover. These propositions have been so many times affirmed in the federal courts that extensive citation of the cases will not be attempted. Dixon Co. v. Field, 111 U. S. 83, 4 Sup. Ct. 315, 28 L. Ed. 360, is the leading case upon the first proposition. That and the cases which have followed it have established this exception to the general rule in respect to the binding force of recitals in municipal bonds. The general rule stated in the second proposition is supported by a multitude of cases. It was held by the supreme court of Tennessee in the case above cited that the power to determine the fact was not delegated to the board, but was superior to its determination; and that is the contention of the defendant here. But the decisions of the supreme court of the United States and of this court make it impossible to accept that conclusion without looking into the reasons which affect it.

In the first place, it must be admitted as a general proposition that it is expedient that the conditions upon which the validity of negotiable paper depends should be ascertained and settled before such obligations are put upon the market. If they were to go out branded with the stigma of uncertainty with respect to the existence of conditions which the law puts upon their issue, but which the officers having charge of their issue declare do in fact exist, it must deeply affect the value of such paper and the price which municipalities must pay for the loan of money. Take the present case. If it had been understood by the purchasers of these bonds that, notwithstanding their recitals and the record of the board importing that the aid was applied for and voted to a Tennessee corporation, they were still subject to the inquiry whether the application for aid was made by a corporation which was in fact a corporation organized under the laws of Tennessee, it is doubtful whether the bonds could have been sold; or, if he had gone so far as to inquire, the intending purchaser would have learned that there was such a corporation whose charter was registered in the county and city from which the bonds were issued, and on looking into the proceedings he would have found that a corporation of that title had made the application, and had therein affirmed that it was organized under the laws of Tennessee, and that it had been submitted by one professing to be the general manager of the company applying, and had been recognized as such by the city. In short, there was nothing of record anywhere in the state of Tennessee which would raise a doubt of the regularity and bona fides of the issue of the bonds. It is difficult to believe that the Tennessee legislature intended that the bonds, which it authorized the city to issue in payment for stock which it might as a matter of local policy desire to subscribe for, should be subject to a fatal infirmity arising from the abuse of its authority by the city, or intended that the validity of the bonds which the city might issue would, notwithstanding the city has got all it bargained for, remain an open question, only to be ultimately settled by such a controversy as we have before us. We think it more reasonable to suppose that the legislature intended that, if doubts should arise in respect to the existence of the conditions on which the power might be exercised, those charged with its exercise should determine such questions for the city. No other board or tribunal was within the range of the proceedings prescribed, and they must be determined by the city board, or remain a peril to the bonds to their latest day. It was necessary to the formation of a corporation that its articles should be registered in the county register's office. Was it intended by the legislature that the purchaser should search the registers' offices in each of the great number of counties in Tennessee to find out whether there were to be found therein the articles of incorporation of the company whose stock had been paid for by the bonds? It is to be observed that the statute does not point to any definite public record to which the intending purchaser might refer for information. There is that, however, in the statute which suggests that the board was to consider whether the application

was such as it might properly submit to a vote of the electors. The language is:

"Should a majority of the board of mayor and aldermen, or other governing or representative body of such city or town, be of the opinion that an election should be held in the same to determine whether or not such city or town should make the subscription, it shall so order."

It was not the unqualified duty of the board to order an election. What matters were to be considered by the board? Obviously, not the general question of expediency. That was for the electors to determine. It would seem that the qualification of the applicant was one of the subjects, and an important one, to be considered in forming an opinion whether the application should be submitted to the electors or not. Seeing that the statute refers to no source of information, that it is indispensable to the use of such securities that they should carry upon their face, or that the law governing their issue should direct the purchaser to, the evidence of their authenticity, and that the statute leaves to the board the general question of the propriety of submitting the proposition to the electors, and there was no constitutional provision in the way, we think it should be presumed that the legislature intended that such a question as this should be solved by the board before further proceeding. And this conclusion would seem to be in harmony with many decisions upon analogous questions. It can by no means be affirmed that the prescribing by the legislature of conditions upon which authority to act is granted nullifies what is done under such authority in case the specified condition does not in fact exist. The general trend of the decisions, at least in the federal courts, and especially with reference to municipal bonds, the security of which is so important, not only to the purchasers, but to the municipalities which have occasion to use them, is to hold that, unless there is clear evidence to the contrary, the legislature intended that the question of the existence of the conditions upon which the power is granted should be referred to the governing body of the municipality exercising the power. Thus, to refer to particular analogous instances, a statute which gives power to issue bonds to refund existing indebtedness has been held to refer the question whether there was such indebtedness to the proper local board; and its representation in the bonds, whether expressly or by implication, that such indebtedness existed, was held to preclude the municipality from disputing it in a suit by a bona fide holder. City of Cadillac v. Woonsocket Inst. for Sav., 7 C. C. A. 574, 58 Fed. 935; School Dist. v. Rew, 49 C. C. A. 198, 111 Fed. 1; Gunnison Co. v. E. H. Rollins & Sons, 173 U. S. 255, 19 Sup. Ct. 390, 43 L. Ed. 689. So, when the constitution expressly forbade the issuance of such obligations beyond a certain stated limit, a like reference to the municipal authorities of the question whether the issue transcended the limit was implied, and their recital to the effect that it did not was held to estop the municipality from alleging the fact to have been otherwise than as thus represented, as against a bona fide holder. Commissioners v. Potter, 142 U. S. 355, 12 Sup. Ct. 216, 35 L. Ed. 1040. The exception before alluded to, as well as the general rule itself, is clearly brought out in

certain cases of similar character, where the statute pointed to some definite public record accessible to the purchaser as the test whereby it could be ascertained whether the condition upon which the power was granted had been observed, and in which cases it was held that the municipality was not estopped by recitals in bonds even in case the plaintiff was a bona fide holder. Sutliff v. Board, 147 U. S. 230, 13 Sup. Ct. 318, 37 L. Ed. 145, and Dixon Co. v. Field, above cited.

Another class of cases is those where power has been granted to issue bonds to pay the expenses of certain public improvements, and the local board, upon their determination, contrary to the law of the state, that a railroad was a public improvement, issued bonds in aid of the railroad, and recited in them that they were issued by virtue of the act. The same estoppel was maintained. Risley v. Village of Howell, 22 U. S. App. 635, 12 C. C. A. 218, 64 Fed. 453; Clapp v. Village of Marice City, 49 C. C. A. 251, 111 Fed. 103. In these cases the city (or village) had no power whatever to issue bonds to aid railroads. And in another instance, where power was given to issue bonds to postpone the payment of its indebtedness, and the village had none, but issued the bonds in aid of a glass factory, and recited in them that they were issued under the authority of the statute, there was the same ruling. Village of Kent v. Dana, 40 C. C. A. 281, 100 Fed. 56.

A number of decided cases could be cited as authority for holding that, if there had been no such railroad company incorporated in Tennessee at any time, the issue of these bonds with such recitals, and reference to the statute authorizing the issue of such bonds (there being nothing in the statute or bonds specifically directing the attention of the purchaser to anything which he should take care to look to), would bind the city, if they should come to the hands of a bona fide holder for value. In the recent case of School Dist. v. Rew, 49 C. C. A. 198, 111 Fed. 1, in an elaborate opinion upon an ample citation of authorities, the circuit court of appeals for the Eighth circuit summed up the law as follows:

"If the laws are such that there might under any state of facts or circumstances be lawful power in a municipality or quasi municipality to issue its bonds, it may by recitals therein estop itself from denying that those facts or circumstances exist, unless the constitution or the act under which the bonds are issued prescribes some public record as the test of the existence of some of those facts or circumstances."

Probably this statement should be so modified that the fact represented by the recital be one which the law empowers or makes it the duty of the local board to ascertain and determine as a condition to its further proceeding. We have already stated the reasons for thinking that the statute in question imposed such a duty, and by consequence gave the necessary authority. But, independently of these considerations, suppose the record of the city board to be what it is, and suppose, also, as now contended, that in point of fact the corporation intended was the foreign corporation; what would be the rights of the bona fide holder of these bonds? It would exhibit a case where the officials and the electors of the city, in violation

of the statute, had permitted the foreign corporation to masquerade in the guise of a corporation of Tennessee, and voted and issued the bonds, reciting that it was a Tennessee corporation which made the application and in whose favor the subscription had been made. Such a proceeding would be an abuse of power, and it would be a gross fraud for the city to impeach the bonds by now pleading the subterfuge. The law is well settled that such a defense is not maintainable. Several of our own decisions are grounded upon a principle which forbids such a defense as against one who has purchased the bonds in good faith and for value. City of Cadillac v. Woonsocket Inst. for Sav., Risley v. Village of Howell, Village of Kent v. Dana, and Clapp v. Village of Marice City, above cited.

It is further contended that the bonds (and coupons) are void for the reason that they were in an amount in excess of 10 per cent. of the taxable property of the city. It was shown that they were in excess of 10 per cent. of the assessments for 1889, but it is not shown what was the amount of the assessments for 1890. The bonds were issued May 15, 1890, and for aught that appears the assessment for that year may have been large enough to warrant the issue. But, aside from the effect of the recitals in the bonds upon this question, the statute does not refer to the assessment, but makes the basis the "taxable property of the city." This was the test prescribed by the statute under which the bonds involved in Marcy v. Oswego, 92 U. S. 637, 23 L. Ed. 748, and Humboldt Tp. v. Long, 92 U. S. 642, 23 L. Ed. 752, were issued; and in the latter case Mr. Justice Strong, delivering the opinion of the court, said, at page 645, 92 U. S., and page 754, 23 L. Ed.:

"The assessment rolls of the township may have been proper evidence for the consideration of the board of county commissioners, when they were inquiring what the value of the taxable property of the township was; but the bonds are not invalid in the hands of a bona fide holder by reason of their having been voted and issued in excess of the statutory limit, as shown by the rolls. Whatever may be the right of the township as against those who issued the bonds, it cannot set up against a bona fide holder of the bonds that the amount issued was too large, in the face of the decision of the board and their recital that the bonds were issued pursuant to and in accordance with the Act of 1870."

And it is well known that the taxable value of property and the actual assessment for the purpose of taxation are often very different things. We think, therefore, that this question is concluded by the recitals of the bonds in question, and that this ground of defense is unavailable.

The judgment must be reversed, and a new trial ordered.