ALFRED E. DRISCOLL, GOVERNOR OF THE STATE OF NEW JERSEY, ET AL., INFORMANTS AND PLAINTIFFS-RESPONDENTS, v. BURLINGTON-BRISTOL BRIDGE COMPANY, A NEW JERSEY CORPORATION, ET ALS., DEFENDANTS-APPELLANTS, AND SARJEM CORPORATION, AN ILLINOIS CORPORATION, AND ROBERT M. SHERRITT, DEFENDANTS.

Argued October 8, 1951—Reargued November 5, 1951—Decided January 21, 1952.

434

438

440

442

*Mr. Milton M. Unger* argued the cause for the appellants Gladys Parks, Robert K. Bell, Rickard W. Parks, Theodore R. Hanff, Thomas J. Christensen, Mildred Powell Meader, Paul R. Powell, Irene C. Powell, Clifford R. Powell, Richard C. Nongard, and Tuthill Ketcham and Roland H. Murray, individually and trading as Ketcham & Nongard (*Messrs. Milton M. and Adrian M. Unger*, attorneys).

Mr. *Robert L. Hood* argued the cause for the appellants Burlington County Bridge Commission, Howard R. Yocum, Daniel Lichtenthal, and Fred C. Norcross, Jr., individually and as members of the Burlington County Bridge Commission, the Board of Chosen Freeholders of Burlington County, Leroy Church, Frank A. Snover, Albert C. Jones, Stanley I. Russ and Clarence G. Price, individually and as members of the Board of Chosen Freeholders of Burlington County, Tacony-Palmyra Bridge Company and Burlington-Bristol Bridge Company (*Mr. Thomas D. Begley,* attorney).

Mr. *Donald B. Kipp* argued the cause for the appellants Chemical Bank & Trust Company and B. J. Van Ingen & Co. (*Messrs. Pitney, Hardin & Ward,* attorneys; *Messrs. Frank C. O'Brien, William P. Reiss,* and *Robert P. Hazlehurst, Jr.,* on the brief).

Mr. *James D. Carpenter* argued the cause for the appellants Bacon, Stevenson & Co., Blair, Rollins & Co. (formerly Blair & Co.), Braun, Bosworth & Co., Dolphin & Co., Equitable Securities Corporation, John Nuveen & Co., R. S. Pressprich & Co., Welsh, Davis & Co., and Robert Showers (*Messrs. Carpenter, Gilmour and Dwyer,* attorneys; *Messrs. Thomas L. Morrissey* and *Milton A. Dauber* on the brief) and for the appellant Stranahan Harris & Co. (*Messrs. McCarter, English and Studer,* attorneys).

Mr. *Edward A. Markley* argued the cause for the appellant Fitzgerald & Co. (*Messrs. Markley and Broadhurst,* attorneys; *Mr. James J. Langan* on the brief).

Mr. *Harold A. Price* argued the cause for the appellants Estabrook & Co., Harris, Hall & Co., Lyons and Shafto, and R. D. White & Co. (*Messrs. Schenk, Price, Smith and King,* attorneys).

Mr. *Walter D. Van Riper,* Special Counsel to the Governor and the Attorney-General, argued the cause for the respondents (*Mr. Theodore D. Parsons,* Attorney-General).

The opinion of the court was delivered by

VANDERBILT, C. J.   These appeals are before this court by way of certification granted on the petitions of the several defendants-appellants to review the judgment of the Chancery Division of the Superior Court entered in the cause. The facts, which it is necessary to recount in some detail, present a disillusioning picture of public officials surrendering their independence and abnegating their obligation of public trust under the influence of prominent persons seeking to further their private interests.

I.

This action was instituted on December 3, 1948, by the Governor and the Attorney-General of the State of New Jersey to set aside the acquisition on October 22, 1948, by the Burlington County Bridge Commission of two toll bridges across the Delaware River between points in Burlington County and Pennsylvania.   One of these bridges between Burlington, New Jersey, and Bristol, Pennsylvania, is known as the Burlington-Bristol Bridge, and the other between Palmyra, New Jersey, and the Tacony section of Philadelphia as the Tacony-Palmyra Bridge.   The construction of these bridges was authorized by separate special acts of Congress, the Burlington-Bristol Bridge by chapter 351, Session I, 69th Congress, 1926 (44 *Stat. Part 2, p.* 588), and the Tacony-Palmyra Bridge by chapter 56, Session II, 69th Congress, 1927 (44 *Stat. Part 2, p.* 1024).   The pertinent provisions of each of these special acts of Congress are identical, and for convenience they are here set forth at length:

"Sec. 4.   After the date of completion of such bridge, as determined by the Secretary of War, either the State of New Jersey, the State of Pennsylvania, any political subdivision of either of such States within or adjoining which any part of such bridge is located, or any two or more of them jointly, may at any time acquire and take over all right, title, and interest in such bridge and approaches, and interests in real property necessary therefor,

by purchase, or by condemnation in accordance with the law of either of such States governing the acquisition of private property for public purposes by condemnation. If at any time after the expiration of twenty years after the completion of such bridge it is acquired by condemnation, the amount of damages or compensation to be allowed shall not include good will, going value, or prospective revenues or profits, but shall be limited to the sum of (1) the actual cost of constructing such bridge and approaches, less a reasonable deduction for actual depreciation in respect of such bridge and approaches, (2) the actual cost of acquiring such interests in real property, (3) actual financing and promotion costs (not to exceed 10 per centum of the sum of the cost of construction of such bridge and approaches and the acquisition of such interests in real property), and (4) actual expenditures for necessary improvements.

Sec. 5. If such bridge shall be taken over and acquired by the States or political subdivisions thereof under the provisions of section 4 of this Act, the same may thereafter be operated as a toll bridge; in fixing the rates of toll to be charged for the use of such bridge, the same shall be so adjusted as to provide as far as possible a sufficient fund to pay for the cost of maintaining, repairing, and operating the bridge and its approaches, to pay an adequate return on the cost thereof, and to provide a sinking fund sufficient to amortize the amount paid therefor within a period of not to exceed thirty years from the date of acquiring the same. After a sinking fund sufficient to pay the cost of acquiring such bridge and its approaches shall have been provided, the bridge shall thereafter be maintained and operated free of tolls or the rates of toll shall be so adjusted as to provide a fund not to exceed the amount necessary for the proper care, repair, maintenance, and operation of the bridge and its approaches. An accurate record of the amount paid for acquiring the bridge and its approaches, the expenditures for operating, repairing, and maintaining the same, and of the daily tolls collected shall be kept, and shall be available for the information of all persons interested."

The two bridges were constructed pursuant to these grants of authority from the Federal Government by the Burlington-Bristol Bridge Company and the Tacony-Palmyra Bridge Company, respectively, New Jersey corporations organized and existing under and by virtue of chapter 247 of the Laws of 1925 (*R. S.* 48:5–13 *et seq.*) entitled "An Act to authorize the formation of companies for the purpose of constructing, maintaining and operating bridges over the Delaware River, and regulating the same." Section 9 of this act (*R. S.*

48:5–22) provides for the acquisition by the State of New Jersey of any bridge constructed by a company organized thereunder:

"The state reserves to itself the right, acting in conjunction with any adjoining state or municipality thereof, to acquire any bridge constructed by any such company at the following times and upon the following terms:

a. At the expiration of five years after the opening of any bridge for public use, for the total costs thereof of whatever nature and upon assumption of all obligations or liabilities of the bridge company, for the construction of the bridge, with the approaches thereto and appurtenances thereof, plus fifteen per cent of the cost;

b. At any time thereafter, at such total cost and upon assumption of such obligations or liabilities, plus fifteen per cent of the cost, less two per cent per annum of the total cost for each year after the expiration of five years from the date of the opening of the bridge for public use.

Every company organized under this article consents to the acquisition by the state pursuant to this section of any bridge constructed by the company."

While it does not appear that the Secretary of War has ever certified the date of completion of either of the bridges, the Burlington-Bristol Bridge was actually completed and opened for traffic on about May 1, 1931, and the Tacony-Palmyra Bridge on about August 15, 1929. Since those dates the bridges were continuously owned and operated by their respective companies until the time of their acquisition by the Burlington County Bridge Commission on October 22, 1948.

Some time in 1946 the defendants Robert K. Bell, Thomas J. Christensen, Theodore R. Hanff, Tuthill Ketcham, Richard C. Nongard, Rickard W. Parks, and Clifford R. Powell became interested in purchasing the stock of the Burlington-Bristol Bridge Company, then owned by a small group of stockholders in Pittsburgh, with an eye toward selling the bridge to some public agency. Toward this end they organized themselves into a syndicate with a specific role intended for each. Bell, counsel for the Cape May Bridge Commission, was to render advice with respect to the acquisition,

operation and resale of the bridge. Christensen and Parks, who were in the investment business, were to sell preferred stock to assist in the financing, although as the matter developed this became unnecessary. Hanff, a bridge-painting contractor, was acquainted with the Pittsburgh stockholders and was to conduct the negotiations with them. Ketcham and Nongard, members of a Chicago firm specializing in bridge securities, were to arrange the mortgage financing for the purchase. Powell was to put through the resale of the bridge to Burlington County, a role for which he was peculiarly well equipped. Long the dominating political figure in Burlington County, he had for years represented it in the Legislature, first as a member of the Assembly and as Speaker of that body, later in the State Senate, where he also served as President. For 35 years he was active in the State National Guard and from 1939 until 1948 he was its commanding general. At the trial of this action he professed to have lost his political influence following his return from military service abroad, but nonetheless he stepped in as chairman of a group seeking to correlate the efforts of the various factions of his party in the county. More conclusive as to his political control and influence in the county, however, is the manner in which the members of the board of chosen freeholders and of the bridge commission responded without hesitation to his every request in effectuating the transaction here under scrutiny.

In December, 1946, Hanff, who had been authorized by the syndicate to offer as much as $1,500,000 for the Burlington-Bristol Bridge Company stock, completed arrangements with the Pittsburgh owners for its purchase at a price of $1,350,-000. This was to be financed by the placing of a $1,000,000 mortgage on the bridge and by giving to the sellers notes for $350,000 secured by a pledge of the bridge company stock. No cash was required to be advanced by the syndicate to meet the purchase price, although subsequently the mortgagee called on it to contribute $25,000 to the company for use as working capital, and in addition some $25,000 was paid

out by the syndicate for the expenses incurred in the transaction. These contributions were paid in by the members of the syndicate *pro rata* in accordance with their respective stock interests, Hanff, the firm of Ketcham and Nongard, and Powell each having a one-quarter interest, the other one-quarter interest being divided among the other members of the syndicate. The time for the closing of the transaction was to depend upon the placing of the mortgage, a task assigned to Ketcham and Nongard.

To represent it in the purchase of the bridge, its financing and its resale to Burlington County, the syndicate retained the firm of Hawkins, Delafield and Wood, New York municipal bond attorneys. In the spring of 1947 Henry E. Russell of that firm called the attention of the syndicate to the fact that there were statutory obstacles to the accomplishment of its plan, namely, that under the Delaware Bridge Companies Act it was doubtful whether a bridge company had the power to sell its bridges or to merge, consolidate, or dissolve (*R. S.* 48:5–18), and that the act reserved to the State of New Jersey, acting in conjunction with the State of Pennsylvania, the right to acquire the bridge at a cost prescribed by a statutory formula (*R. S.* 48:5–22). To remove these obstacles to the planned resale of the bridge, the syndicate had Russell prepare for introduction in the New Jersey Legislature a bill, the purpose and effect of which, among other things, was to deprive the State of its right of acquisition when and if a bridge became the property of a public body. In due course, but not without the intervention of Powell on its behalf, this legislation was enacted into law in the form of an amendment to *R. S.* 48:5–18 and became effective on July 2 as chapter 401 of the Laws of 1947. In the same legislative session a bill was passed (Senate Bill No. 44) amending *R. S.* 27:19–28 so as to permit a county bridge commission to acquire or construct interstate bridges without the consent of the other state involved, preventing the construction or transfer of ownership of any other bridge within a ten-mile radius thereof without the consent of the commis-

sion, and providing that the obligations of a county bridge commission would be legal investments for all purposes. This bill was vetoed by the Governor because of its provisions as to legal investments. Notwithstanding the failure of the selling syndicate to have this legislation approved, they were able to complete the arrangements for financing. On October 29, 1947, the transaction was closed and the members of the syndicate, who with their nominees were now the company's sole stockholders, elected certain of their number directors and officers of the company and took over the operation of the Burlington-Bristol Bridge.

The syndicate next turned its attention to the Tacony-Palmyra Bridge which is considerably larger and more heavily travelled than the Burlington-Bristol Bridge. From 1940 to 1942 Robert M. Sherritt, who was engaged in the business of buying and selling bridges and other public utilities and who operated through the Sarjem Corporation, an Illinois corporation of which he was the president and principal stockholder, had been interested in the acquisition of the Tacony-Palmyra Bridge. In late 1947 he again became interested and actively began to negotiate for the purchase of the stock of the Tacony-Palmyra Bridge Company, which was then held by some 1,300 persons scattered over a wide area. This activity by Sherritt was noted in financial circles and was also the subject of rumors within Burlington County. It so happened that Hanff, the newly elected president of the Burlington-Bristol Bridge Company, early in 1948 also became a stockholder of the Tacony-Palmyra Bridge Company and that for years both Ketcham and Nongard had been personally acquainted with Sherritt. While it appears that the syndicate must have contemplated the acquisition of the Tacony-Palmyra Bridge for some time previously, the testimony is that it was not until May, 1948, that Ketcham first discussed with Sherritt the purchase of the Tacony-Palmyra Bridge Company and arranged for Hanff to introduce Sherritt to the president and principal stockholder of the company. In the following months plans

were developed for the purchase of the stock of the Tacony-Palmyra Bridge Company by the Sarjem Corporation and for its resale to the Burlington-Bristol Bridge Company. On September 7, 1948, Sherritt sent out letters to all the stockholders of the Tacony-Palmyra Bridge Company offering to purchase their stock at virtually twice the price at which it was then selling on the Philadelphia Exchange, the total offer amounting to $6,487,500. By October 5, 1948, Sherritt had secured options expiring on November 1, 1948, to purchase 80 per cent of the stock, an amount more than sufficient to compel a reorganization of the company and thereby to effect the acquisition of the complete ownership of it, *R. S.* 14:11–1 *et seq.* made applicable by *N. J. S. A.* 48:5–18*f*. Immediately thereafter, on October 6, 1948, Sherritt met with Ketcham and it was finally agreed that the Burlington-Bristol Bridge Company would purchase all of the Tacony-Palmyra Bridge Company stock for $6,700,000 plus certain expenses, provided the transaction could be consummated by October 22, 1948.

During the period in which Sherritt and Ketcham were negotiating for the purchase of the stock of the Tacony-Palmyra Bridge Company, the members of the syndicate were at work making plans and arranging the details for the sale of both bridges to a Burlington County Bridge Commission. Senate Bill No. 44, which had been vetoed by the Governor in 1947, was reintroduced in the 1948 legislative session through the efforts of the syndicate and was again passed by the Legislature, but this time it was approved by the Acting Governor, becoming chapter 288 of the Laws of 1948 effective August 8, 1948. In March, 1948, Ketcham and Nongard, through the office of their Chicago attorneys, Winston, Strawn, Shaw, and Black, retained David M. Wood of the New York law firm of Wood, King and Dawson, New York municipal bond attorneys, to prepare the legal documents relating to the bond issues which they explained to him would be involved in the sale of the two bridges to a bridge commission to be created in Burlington County. By the

summer of 1948 the discussions with Wood had crystallized to the point where he began to prepare drafts of the necessary resolutions, bonds, and other documents required to create a bridge commission and to complete the bond issue of the planned transaction. In July, 1948, Ketcham visited William G. Laemmel, a vice-president of the Chemical Bank and Trust Company of New York, who proved at the trial to be a most reluctant witness, and explained to Laemmel that he, Ketcham, was to be the underwriter of a bond issue necessary for the acquisition of the two bridges by a Burlington County Bridge Commission. Laemmel was the officer in charge of the bank's investment portfolio and Ketcham discussed with him the possibility of the bank purchasing some of the bonds when issued. At the same time that these arrangements were being made to handle the legal and financial phases of the intended resale of the bridges to the county, the syndicate was also securing appraisals of the bridge properties and audit, traffic and engineering reports from recognized experts in these particular fields. It is highly significant that throughout this whole period of intense activity by the syndicate and despite the various arrangements being made by it, some of them in the name of the Burlington County Bridge Commission, neither the members of the board of chosen freeholders nor any one else in the county except the members of the syndicate itself were aware of the forthcoming transaction, and no bridge commission was in existence or even contemplated by the county authorities.

It was not until September 7, 1948, that the syndicate breathed a word of its plans to any public official in the county. On the evening of that day Powell mentioned to Freeholder Frank A. Snover, while the two of them were riding home together from a political meeting, that he had "a business transaction which would be of benefit to Burlington County." Although he gave no details as to the nature of the transaction—Snover testified that Powell did not even tell him it involved the bridges—Powell nonetheless took care to caution Snover "not to talk about it" even to his col-

leagues on the board of chosen freeholders. Powell explained to Snover that he was not privileged to go into details, but that in a few days he would be in touch with Snover and would introduce him to some of his associates. Snover heard no more of the matter until almost a month later, when on October 3, a Sunday, Powell called for him at his home and drove him to the Hotel Barclay in Philadelphia. There Snover met Hanff and Ketcham for the first time and they, with Powell, explained to him in detail the proposition for selling the two bridges at a price of $12,000,000 to a bridge commission ·to be created by the board of chosen freeholders. They told Snover that the purchase by the bridge commission was to be financed by revenue bonds, which would be an obligation neither of the county nor of the bridge commission and not even a lien on the bridges themselves, and they represented to him that these bonds would not only be completely amortized out of toll revenues within 12 years, but that there would then be available to the county a surplus or profit well in excess of $4,000,000. At this meeting Snover was given an amortization table demonstrating how this would come about, a physical survey of the bridges made by the engineering firm of Modjeski and Masters, and a traffic survey by the engineering firm of Coverdale and Colpitts showing past and estimated future traffic and revenues. He was also told that an appraisal of the bridges to be made by the American Appraisal Company would show the bridges to be worth in excess of $13,000,000. Two additional observations on what transpired at this meeting are important. While Snover was told that Hanff was president of the Burlington-Bristol Bridge Company and that Ketcham was representing it in financial matters, and while Snover was aware that Powell was counsel for the company, it was not revealed to Snover what their interest in the company or the proposed transaction was. Moreover, although they knew Snover was not familiar with matters of this sort— Powell himself testified that Snover "had never heard of revenue bonds" and that the appointment of bridge commis-

sions "was novel to him"—they cautioned him to keep the entire matter confidential. Subsequent events revealed Snover to be deserving of the syndicate's confidence, though not of the trust imposed upon him by the people of Burlington County when they elected him a member of their board of chosen freeholders.

At the same time that the ground work for the imposition of the syndicate's plan on the county was being laid by the taking of Freeholder Snover into its confidence, the legal and financial arrangements were being completed to the last minute detail for the consummation of the entire transaction on October 22, 1948. A final agreement was reached with Sherritt on the purchase of the Tacony-Palmyra Bridge Company stock. Wood completed the preparation of the voluminous legal papers required for the closing, even to the extent of having the names of two of the three members of the proposed bridge commission—these names he had received from Powell in advance of their appointment—inserted in the bond resolution prior to the document being sent to the printer. On October 2, B. J. Van Ingen, president of the New York bond house bearing his name, was requested to form a syndicate for the sale of the bridge commission revenue bonds, and by October 13, 1948, his firm had completed a preliminary draft of the prospectus. A preliminary appraisal report was received from the American Appraisal Company expressing the opinion that the fair value of the two bridges, including both tangible and intangible assets and an initial working capital of $400,000 (which exceeded by $325,000 the working capital which the commission by its contract was to acquire), was not less than $13,000,000 under the ownership of a tax exempt authority. This preliminary appraisal report did not reveal, however, what method was utilized to arrive at this valuation, nor did it include any figures showing the breakdown of the appraisal as between the two bridges or as between tangibles and intangibles. The subsequent final appraisal report, which was not received until after the entire transaction had been consummated,

showed, however, that intangibles had in fact been valued in excess of $3,500,000. A legal opinion as to the validity of the bonds was rendered by the New York law firm of Caldwell, Marshall, Trimble and Mitchell for the benefit of a life insurance company which was a prospective purchaser of the bonds. The Caldwell-Mitchell opinion is significant: it points out the manner in which the purchase of the bridges by the bridge commission was to be effected; it provides the figures from which the amount of profit which the Sarjem Corporation and the selling syndicate will realize on the transaction can be computed; it states that the bridges are subject to condemnation in 1950 and 1951 at an approximate cost, including $1,000,000 for estimated expenses of condemnation proceedings, of $6,300,000; it erroneously estimates that the present acquisition of the bridges by the commission at a price of $12,400,000 will result in a saving to the commission in excess of $1,600,000 (on the basis of the figures set forth in the opinion itself it should have indicated that the proposed acquisition by purchase would result in a loss of $2,168,872 over subsequent acquisition by condemnation); it sets forth the names and holdings of the stockholders of the Burlington-Bristol Bridge Company; and it calls attention to the dangers inherent in the almost simultaneous creation of a bridge commission and its authorization and execution of the contract for the acquisition of the bridges by stating: "Such procedure is not contrary to law, in our opinion, but does have some bearing on the question of improvident purchase in view of the limited time available to the commission to exercise its discretion with respect to the amount of the purchase price. We do not believe, however, that this factor alone is sufficient to cast doubt upon the legality or propriety of the purchase price, or arrangements with respect thereto, in view of the previous knowledge of and discussions concerning the subject matter by the Board of Chosen Freeholders and the persons to constitute the membership of the commission." Obviously Caldwell, Marshall, Trimble and Mitchell were misinformed as to the part being

played by the freeholders and the bridge commissioners. Laemmel of the Chemical Bank inspected the bridge properties. He, as well as loan and trust officers of the bank, discussed various financial phases of the transaction with Ketcham and Nongard, with William C. Mulligan of Winston, Strawn, Shaw and Black, the Chicago law firm representing the selling syndicate in corporate and financial matters, with Wood who was handling the bond issue for the syndicate, and with Sherritt. As a result of these conferences the Chemical Bank committed itself to purchase a sizeable block of the bonds, to make the several closing and clearing loans that would be required, and to handle the closing on October 22. It is interesting that despite the negotiations participated in by the various officers of the Chemical Bank prior to the closing on October 22, they had no contact at all with any official of Burlington County. They testified that they simply assumed that the freeholders and the prospective bridge commissioners were being kept informed by the selling syndicate and were actively participating in the negotiations with it. Such was not the fact, however, and in the circumstances it appears naive on the part of the officers of the Chemical Bank to have so assumed. All of these steps were taken by and at the instance of the selling syndicate prior to the appointment of any one to membership on a bridge commission, prior to the creation of a bridge commission by the board of chosen freeholders, and even prior to any of the members of the bridge commission-to-be or of the board of chosen freeholders, with the exception of Snover who was pledged to secrecy, having any knowledge whatsoever of the pending transaction.

The Burlington County Board of Chosen Freeholders held meetings on October 7 and October 15. Although Freeholder Snover had previously been told about the selling syndicate's proposition by Powell on September 7 and had had it explained to him in detail by Hanff, Ketcham and Powell in Philadelphia on October 3, and although he had been in almost daily contact with Powell thereafter and knew that

the plan was to be presented to the board for final action on October 22, he made no mention of it to the other free-holders when they met on October 7 and October 15. His excuse for failing to make disclosure of this matter which so vitally concerned the county was that the sellers were not ready, that he "had not been told that they had everything in shape." He assumed, however, that the sellers "had everything in shape to go ahead" and complied without hesitancy, when Powell telephoned him requesting that he call a conference of the freeholders at his home on the night of October 20. On the afternoon of October 20, moreover, preparatory to the meeting of the board of chosen freeholders that night, Powell went to the office of Thomas D. Begley, the county solicitor and as such legal adviser of the board of chosen freeholders. Begley was also acting as chairman of the county committee supporting Freeholders Snover and LeRoy Church who were then running for reelection. These candidates, incidentally, were also supported by Powell in his capacity as chairman of a harmony group consisting of representatives of the various factions of the party in the county. On this occasion Begley learned for the first time about the syndicate's plan to sell the bridges to the county. Powell gave him the preliminary appraisal report, the amortization table, the Caldwell-Mitchell opinion, and also a copy of an address on the subject of municipal revenue bonds which Wood had delivered two years before at a meet-ing of a section of the American Bar Association. In this address Wood advocated secrecy in the consummation of deals of this kind, stating that "while 'open covenants openly arrived at' is an excellent idea in theory, in practice you find it impractical."

That evening four of the five members of the board of freeholders, Snover, Church, Clarence C. Price, and Stanley I. Russ—Freeholder Albert C. Jones was absent and testified that no effort was made to get in touch with him—assembled at Snover's house. Before beginning to confer, however, they awaited the arrival of Powell who, along with Snover,

explained the details of the selling syndicate's proposition.
The freeholders present were told, among other things, that
the proposition had to be accepted "as is" and that the entire
transaction had to be concluded in less than 48 hours. It was
also misrepresented to them that "it would be a great oppor-
tunity for Burlington County to make $4,000,000 over a
period of 12 years" and that the municipalities of Burlington
and Palmyra would not suffer from a loss of ratables since
provision would be made for payments to them by the bridge
commission in lieu of taxes. Thus the masterminds of the
selling syndicate sought to lull to sleep two groups which
might otherwise be inclined to raise objections to their
scheme. Copies of the various reports and other documents
that had been prepared for or obtained by the syndicate were
circulated. During the course of the evening Begley arrived
and gave his approval as to the legal aspects of the transac-
tion, although he himself was not experienced in matters of
this sort and had only been able to study the complicated
documents of the planned transaction for a few hours.
Begley further expressed the opinion that it was not feasible
for the county to condemn the bridges, since it had a statutory
debt limit of $2,500,000 of which only about $2,000,000 was
then available, and that as a practical matter revenue bonds
could not be utilized to finance condemnation proceedings.
No consideration was apparently given to the relative ad-
vantages to be gained through condemnation by the State
itself or by some other public agency, even though Snover
at least was acquainted with the fact that acquisition by a
port authority was already under consideration by the State.
Neither did any of the freeholders evidence any desire to go
behind or beyond the reports furnished them by the sellers
or to bargain over the price. For example, when asked
whether he should not have made inquiries to determine what
the value of the bridges was in the hands of private owners
who were subject to taxation and condemnation, Freeholder
Price testified "I didn't make inquiries; I just wasn't

interested enough to go and take the time to do it when we had these other reports."

Before the end of the meeting the discussion turned to the selection of bridge commissioners. Snover proposed the names of Fred C. Norcross, Jr., and Howard R. Yocum. Norcross had previously been a freeholder, but had resigned to serve in World War II and upon his return had gone to the freeholders and requested that he be considered for some future political appointment. Yocum, an attorney, was interested in politics and had been proposed for political office by his local political organization. More important, Yocum was known to Powell, having served as Powell's personal military aide for over a year while both were on active duty with the army in World War II. Snover had previously discussed the subject of appointments with Price—without, however, revealing that a bridge commission was involved— and with Powell and they had decided on these two men: in fact, their names were already printed in the bond resolution of the still-to-be-created bridge commission. This document was among the papers distributed to the freeholders that night. Begley pointed out that under the statutes one of the three bridge commissioners had to be a member of the opposing political party, and so it was mutually agreed that Daniel Lichtenthal, a former county prosecutor, would be the third appointee. It was decided that Powell was to notify Norcross and Yocum of their selection and that Snover would notify Lichtenthal. Powell informed the freeholders that there would be a meeting in Philadelphia on the following day, and with an admonition to secrecy the meeting concluded.

On the afternoon of the next day, October 21, the newly selected bridge commissioners-to-be journeyed in accordance with instructions to the Hotel Barclay in Philadelphia, where they were joined by Freeholder Price—the other freeholders were too preoccupied with other matters to attend—County Solicitor Begley, Syndicate Members Bell, Hanff, Ketcham and Powell, and Wood, the syndicate's attorney. This was

the first time that Wood had come in contact with the county officials and prospective officials. He testified that up until this time he had been under the impression that they were aware of and had been taking part in the preparations, but that he then realized that this was not the case. Doubt is cast on this avowed ignorance of Wood prior to this meeting as to the participation by the prospective bridge commissioners by the fact that less than a week before Powell had been unable to furnish Wood with the name of the third commissioner for inclusion in the bond resolution. In any event, Wood was not deterred from later giving an opinion unqualifiedly approving the bond issue and from advising the various persons interested in it that everything was entirely proper and legal, action that was in accord with Wood's published philosophy on such transactions. At this meeting the syndicate members and Wood explained the details of the transaction to the prospective appointees and presented them with the numerous and voluminous reports, opinions and other papers pertaining to the transaction which they as sellers had secured or prepared. It was made clear to the bridge commissioners-to-be that this was "a one package deal" which had to be accepted *"in toto."* Strangely enough the commissioners-to-be were even content to accept the interest rates on the bonds as fixed by the syndicate without making independent inquiry as to whether or not they were reasonable—inexcusable neglect in view of their knowledge that Ketcham and Nongard were in charge of the financial aspects of the transaction for the selling syndicate and were also to be the purchasers of the entire bond issue. Nor was any question raised and independent advice sought as to whether $355,710 was a reasonable amount to be paid to Ketcham and Nongard for bond discount. In fact, no independent inquiry or investigation was made or advice sought with respect to any phase of the whole complex transaction. Not a single change in the entire proposal was made or even suggested by the commissioners-to-be or for that matter by the freeholders; they were all apparently quite willing to

go along with anything and everything the syndicate proposed to them. The commissioners-to-be did not even make an effort to ascertain what their duties and responsibilities as bridge commissioners would be. Although there was testimony that such was not the fact, the inference is nevertheless inescapable that their appointment as bridge commissioners was conditioned upon the willingness of the prospective appointees to go through with the plan as proposed. The commissioners-to-be were informed of the need for both haste and secrecy, attorney Wood explaining to them that the matter must be kept "absolutely private and confidential" to avoid the possibility of taxpayers' suits. Before the end of the meeting Yocum, Norcross and Lichtenthal apparently gave the plan their approval, for they agreed among themselves as to who the officers of the bridge commission would be, received instructions as to just how they were to proceed on the morrow and left prepared to assemble the next day at the Burlington County Court House to effectuate the transaction.

At 10:30 o'clock the next morning, Friday, October 22, the board of chosen freeholders met for its scheduled public meeting. As the first order of business and without discussion it unanimously adopted a resolution creating the Burlington County Bridge Commission, appointing Yocum, Norcross and Lichtenthal as members thereof and fixing their combined annual salary at $9,000, to be divided among them pursuant to statute. This action was taken notwithstanding the fact that three of the freeholders had first learned of the plan at the meeting at Snover's house only 36 hours before, and even though Freeholder Jones, who had been absent at that meeting, had not learned of the plan until a few minutes earlier when the freeholders had met in caucus. The willingness of Jones to "follow the leader" without exercising his own judgment and discretion is well indicated by the fact that when presented at the caucus with the various reports pertaining to the bridges he said, "I do not have time to digest all of these, but if these gentlemen say it's a good deal,

it is all right for me." The extent of Jones' lack of knowledge of the transaction is further revealed by his testimony to the effect that he did not even know there was a formula for purposes of condemnation and that if he had so known he would have acted differently. Incidentally, at the time Jones was running for Congress with the aid and support of Powell. It is to be borne in mind, moreover, in evaluating the conduct of the freeholders that none of them had secured advice or counsel independent of that urged upon them by the sellers, except the advice of Begley, who himself was unfamiliar with these matters, and all of them were inexperienced in transactions such as this.

The syndicate's plan was carried out with unparalleled speed. The prospective bridge commissioners, together with Begley, Ketcham, Powell and Wood, were already assembled in the Court House adjoining the Administration Building where the board of chosen freeholders was in session. When they received a certified copy of the board's resolution creating the bridge commission and appointing themselves as commissioners, they immediately and without discussion proceeded under the supervision of Wood to do that which they had been briefed to do the night before. They elected Yocum chairman, Lichtenthal vice-chairman, and Norcross secretary-treasurer of the commission. They at once adopted by-laws and a host of resolutions, reports and agreements which had been prepared for them in advance by the syndicate's attorneys. They appointed the selling syndicate's firm of traffic engineers, Coverdale and Colpitts, to be their own without their having been in touch with it or even being advised as to its fees, and they adopted the firm's report on traffic revenues which had been prepared for the sellers. They appointed Frank Masters of the firm of Modjeski and Masters as their consulting engineer, and adopted the report which he had made to the sellers on the value and condition of the bridges. They adopted a resolution providing for the acquisition of the bridges by the issuance of revenue bonds—without even stating the purchase price—and asking the board of chosen

freeholders for approval. This resolution was presented at once to the freeholders who had remained in session and received their immediate approval. Minutes later, without its even being read, the commissioners adopted the 38-page bond resolution providing for the issuance of $12,400,000 in revenue bonds. They authorized the execution of complicated contracts, previously prepared by the sellers, to purchase the stock of the Burlington-Bristol Bridge Company for $12,000,-000, to retain the Chemical Bank as escrow agent, and to dispose of the bonds through the firm of Ketcham and Nongard. They also adopted a resolution appointing Begley as their attorney at an annual salary of $5,000 and retaining the law firms of Winston, Strawn, Shaw and Black of Chicago, and Wood, King and Dawson of New York to represent them at the closing, but without compensation. It is to be noted, however, that both firms had been and still were representing the sellers and according to Wood he was not even aware of this resolution, which had been prepared by Begley, until the time of the trial of this action. He recognized only Ketcham and Nongard as his clients, and testified that he assisted the bridge commission merely as a favor. By 11:30 A. M., less than an hour from the time their meeting had commenced, the bridge commissioners had organized and put through a $12,000,000 transaction of which they were totally ignorant only 18 hours before and about which they had no information or advice other than that furnished them by the sellers. In the language of the trial court they had acted "with a celerity which can only be attributed to a total abnegation of independent investigation or judgment."

By 2 P. M. on October 22 the bridge commissioners had reached the Chemical Bank in New York and were prepared to be led through the intricacies of the closing of the transaction for the purchase of the bridges. The closing took until midnight and was attended by some 30 or 40 persons. Among those present, in addition to the bridge commissioners, were Begley, Wood, Mulligan, some members of the selling syndicate, and representatives of the Chemical Bank, of the

firm of Ketcham and Nongard, of B. J. Van Ingen & Co., of the Sarjem Corporation and of the various other parties participating in one capacity or another in the complex transaction.

While it is not necessary to trace the maze of technicalities through which the parties were guided at the closing, it is important to take account of the results of the events that transpired during the afternoon and evening of October 22. The Sarjem Corporation realized a gross profit of $212,500 for its efforts in securing options on the stock of the Tacony-Palmyra Bridge Company. The members of the selling syndicate and their nominees shared *pro rata* by virtue of the sale of their stock in the Burlington-Bristol Bridge Company a gross profit of $3,050,347, which resulted in a net profit of $1,894,637, after the payment of $700,000 to cover the fees and expenses incurred in promoting the transaction, after the payment of $355,710 for bond discount to Ketcham and Nongard, and after the placing of $100,000 in escrow to cover possible tax liability. In addition, by the contract to purchase the stock the bridge commissioners had agreed to return to the sellers, as soon as the amount could be determined by the accountants, certain excesses in the net current assets of the bridge companies at the time of the closing. Checks in payment of this sum, which came to $550,000 and would increase the net profit of the selling syndicate by that amount, were made out and distributed by the bridge commissioners on October 26, but the checks were returned by the recipients on the commencement of legal proceedings. It is interesting to note that Yocum testified that it was during the closing at the Chemical Bank that he first realized that the Commission had contracted to refund this money. It is also to be noted that the bridge commission did not purchase the bridges directly but rather purchased all the stock of the Burlington-Bristol Bridge Company, which in the course of the closing had itself acquired all the stock of the Tacony-Palmyra Bridge Company and had liquidated and dissolved it. The commissioners then proceeded to elect

themselves directors and appoint themselves officers of the Burlington-Bristol Bridge Company, to pay off its obligations, to convey the bridge properties and other assets to themselves as the bridge commission, and finally to dissolve the company. This round-about procedure was followed, not-withstanding some question as to its propriety under the statutes, because of the tax advantages it would have to the sellers over a direct sale of the bridge properties. Another occurrence of interest was the reduction by the commissioners of the tolls on both bridges. This action on the part of the commissioners was taken at a meeting held "over in a corner of the room" in which the closing was going on. This reduction was based upon recommendations by Coverdale and Colpitts, and it quite obviously was effected at this time as an aid to securing public approval of the entire transaction. Indeed, it appears that on the morning of October 22, before the commission had even acquired title to the bridges, a press release, prepared by Begley and containing the news of the reduction, was handed out by the board of chosen free-holders and had appeared in the papers. The schemers endeavored not without some success to "take care of" every conceivable group which had an interest in the transaction. Perhaps the most significant fact with respect to the closing is that the senior officer of the Chemical Bank present at the closing became concerned with respect to the propriety of events leading up to the closing and inquired of the bank's counsel, "Have the county officials, and that includes both the Freeholders and the Bridge Commissioners, been properly informed as to this transaction?" Counsel, relying on Wood, advised that they had, but he took the precaution to request Wood to furnish a supplemental opinion to that effect.

The closing completed, the burden then fell upon B. J. Van Ingen & Co. to organize a syndicate for the disposal of the bonds. Those invited to participate as members of the bond syndicate along with B. J. Van Ingen & Co. were Ketcham and Nongard, Blair & Co., R. W. Pressprich & Co., Equitable Securities Corp., John Nuveen & Co., Stranahan,

Harris & Co., Tripp & Co., Buckley Securities Corp., Estabrook & Co., Harris, Paul & Co., Braun, Bosworth & Co., Bacon, Stephenson & Co., Dolphin & Co., Welsh, Davis & Co., Lyons and Schafto, R. D. White & Co., and Robert Showers, all of whom were made defendants in this action. It was stipulated in the pretrial order that none of the bond syndicate participants "aided, abetted, participated, assisted or cooperated in the formation or the accomplishment of the alleged plan and conspiracy" and it is contended that none of them had knowledge of the events leading up to the culmination of the plan on October 22. Obviously, however, the stipulation was not intended to apply to Ketcham and Nongard, for the issue as to their participation in the fraudulent scheme was fully litigated and the proofs conclusively demonstrate that as members of the selling syndicate they were intricately involved in the whole affair from the very beginning. By their own testimony representatives of B. J. Van Ingen & Co. admitted that they knew that the bridge commission was not created until the morning of October 22, although they claim that they were unaware of the fact that the matter had not been thoroughly discussed with the bridge commissioners well in advance of their appointment. In addition, by virtue of the fact that one of its associates was during the period of time here involved serving as a financial consultant to the engineering firm conducting a survey for a proposed Delaware River port authority, B. J. Van Ingen & Co. had knowledge of the fact that the State of New Jersey was interested in the acquisition of these bridges by condemnation under statutory formula. And there is no doubt that from the various documents presented to them for examination and from the newspaper articles subsequently to be referred to, all of the bond syndicate participants must have known that the bridge commission was created and the entire transaction put through in a single day.

On Monday, October 25, those invited to participate in the bond syndicate met in New York to discuss the bond issue and the terms of participation. At this meeting they had their

attention called to two newspaper articles of the previous day, one in the *Newark Sunday News* and the other in the *New York Herald Tribune*, relating to the sale of the bridges. In these articles it was reported that Governor Driscoll had expressed "surprise and disappointment" over the acquisition of the bridges by the Burlington County Bridge Commission, since it had been planned that the State would take over one or both of the bridges as part of its development of the Delaware River area at a statutory condemnation price substantially below that at which the bridges were purchased by the commission. The article in the *Newark Sunday News,* in addition, reported the Governor as saying that he would commence "a complete investigation" into the whole matter and that he intended "to make it so hot for the Burlington County group that it will find it impossible to get buyers for $12,400,000 in bonds it intends to sell to pay for the bridges." These newspaper articles were regarded lightly by those invited to join the bond syndicate, it being their feeling that the statements made therein were purely "political." Accordingly, relying on the assurances of Ketcham, Nongard and Van Ingen and on the unqualified opinion of Wood as to the legality of the issuance of the bonds and as to their validity, those present at the meeting tentatively agreed to participate in the syndicate and to purchase the bonds.

A second meeting of the bond syndicate participants was held on the next day, October 26, and on the morning of October 27 they affixed their signatures to the formal contract setting forth the terms of their participation. By this contract they appointed B. J. Van Ingen & Co. and Ketcham and Nongard as syndicate managers and authorized the substitution of the note of the bond syndicate for the notes of Ketcham and Nongard and B. J. Van Ingen & Co. then held by the Chemical Bank along with the bonds themselves as security for the loans in the amount of $12,422,866.40 made by the bank to those firms to enable them to purchase the entire bond issue. Accepting this arrangement, the Chemical Bank made a new loan to the bond syndicate,

received as security a note signed by the syndicate managers in behalf of all those participating, retained the bonds themselves as collateral, and cancelled the preexisting obligations of Ketcham and Nongard and B. J. Van Ingen & Co. This note of the bond syndicate was in the amount of $11,317,-156.40 and obligated the individual participants in the bond syndicate severally to the extent of their participation.

On October 26, the day following the first meeting of the bond syndicate, Harry S. Haines and Richard Lippincott, opposition candidates for freeholder in the election then in the offing, instituted a taxpayer's suit against the Burlington County Bridge Commission, the board of chosen freeholders, and their respective members to set aside the sale, and they secured a temporary restraint against the payment by the bridge commission of any moneys except for necessary operational expenses and the appointment of a receiver. While the bond syndicate met for the second time on October 26 and did not sign the formal agreement for the purchase of the bonds until the morning of October 27, so far as the record shows none of its members were aware of the commencement of this action until the afternoon of October 27 when it came to their attention by way of a newspaper account. There is testimony, however, that prior to the final execution of the syndicate participation agreement one of the participants, Tripp, received a telegram from an official of the State with respect to the bond issue, although unfortunately the record does not disclose either the contents of this telegram or the name of the official who sent it. On appeal from the interlocutory order entered by the trial court in the action instituted by Haines and Lippincott the Appellate Division of the Superior Court continued the restraint but vacated the order appointing the receiver, *Haines v. Burlington County Bridge Commission*, 1 *N. J. Super.* 163 (*App. Div.* 1949). On November 23, 1948, B. J. Van Ingen & Co. instituted an action in the Federal District Court naming the bridge commission and Haines and Lippincott as defendants and seeking a declaratory judgment to de-

termine the validity of the bonds. This action was dismissed for want of diversity of citizenship, *B. J. Van Ingen & Co. v. Burlington County Bridge Commission*, 83 *F. Supp.* 778 (*Dist. N. J.* 1949).

In the meantime, on December 3, 1948, the Governor and the Attorney-General of New Jersey instituted the instant action seeking a rescission of the entire transaction, the appointment of a receiver and such other and further relief as the court might deem just and equitable. Named as defendants in this proceeding were the Burlington County Bridge Commission and its members, individually and officially, the Board of Chosen Freeholders of Burlington County and its members, individually and officially, County Solicitor Begley, the two bridge companies, the stockholders of these companies at the time of the sale to the bridge commission, the individual members of the selling syndicate, the Sarjem Corporation and Sherritt its president, the firms of Ketcham and Nongard and B. J. Van Ingen & Co., the Chemical Bank, and the various participants in the bond purchasing syndicate. Immediately after the commencement of this action it was removed to the Federal District Court on the petition of two of the defendants on the ground that it was a matter arising under acts of Congress regulating commerce. The cause, however, was remanded to the Superior Court on the motion of the plaintiffs, the federal court stating: "The search here reveals as basic, real and substantial the issues of whether there was a fraudulent and illegal organization of the Bridge Commission and whether its acts were invalid. The provisions of the federal acts furnish no essential element of those issues and the construction or effect of the federal acts will not determine the basic issues," *Driscoll v. Burlington-Bristol Bridge Co.*, 82 *F. Supp.* 975, 995 (*Dist. N. J.* 1949). In June, 1949, the *Haines* action and the instant case were ordered consolidated and on February 2, 1950, all proceedings in the *Haines* action were stayed and decision therein was deferred until the disposition of this case brought by the Governor and the Attorney-General. In addition, the re-

straints imposed in the *Haines* case were vacated but other restraints were imposed and leave was granted the plaintiffs herein to amend their complaint. Accordingly on February 6, 1950, the Governor and Attorney-General amended their complaint to add, among other things, a demand for money damages against the individual members of the selling syndicate and against the Sarjem Corporation and for a declaration as to the constitutionality of chapter 401 of the Laws of 1947. In response to the complaint, as amended, all of the defendants answered, and certain of them filed counterclaims and cross-claims for the purpose of having the bonds declared valid and to compel the bridge commission to perform its obligations with respect thereto. One of the defendants, Fitzgerald and Co., a stockholder of the Burlington-Bristol Bridge Company at the time of its acquisition by the bridge commission, challenged the validity of the service made upon it in New York and thus the jurisdiction of the court over it.

In due course the action brought by the Governor and the Attorney-General and the counterclaims and cross-claims were pretried and tried, and on December 5, 1950, the trial court filed its decision, *Driscoll v. Burlington Bridge Co.,* 10 *N. J. Super.* 545 (*Ch. Div.* 1950). Finding that the bridge commissioners were derelict in the performance of their public duties and that their contracts, except the contract for the sale of the bonds, were against public policy and void, and concluding that the various holders of the bonds had either participated in or had knowledge of the illegality of the transaction so as to prevent their being holders in due course, the trial court granted the plaintiffs extensive relief. (1) The bridge commission was ordered to restore all that it had received by reconveying the bridges to the Burlington-Bristol Bridge Company, by retransferring the bridge company's stock to its former owners, by repaying to the bondholders the $400,000 received by way of working capital together with net revenues since the time of acquisition, by paying into court the $550,000 of excess net current assets owned by the Burlington-Bristol Bridge Company at the

time of the closing, by resigning as officers and directors of the bridge company, and by accounting for all receipts and disbursements by the commission since October 22, 1948. On taking these steps the bridge commission was to be relieved of any obligations under its contract with the defendant. .(2) The Burlington-Bristol Bridge Company and its former stockholders, the individual members of the selling syndicate and their nominees, were ordered to repay to the bondholders all moneys received from them, each to disgorge the part of the purchase price received. (3) The bondholders were subrogated to the rights of mortgage or other lien holders as of October 22, 1948, to the extent that the money of the bondholders was used to discharge the same, and in addition they were granted a lien on all revenues of the bridges until the bonds should be repaid, subject, however, to the right of the State to acquire the bridges. (4) All parties were directed to take such action as might be necessary to carry out the order of the court. (5) The right of the State to acquire the bridges upon the terms provided in applicable statutes was held to be unaffected by virtue of the fact that the bridges were being returned to private ownership. (6) The action was dismissed as against Sherritt and the Sarjem Corporation for lack of proof that they participated in the illegal transaction.

A judgment was subsequently entered to give effect to the trial court's decision. It provided, in addition to the relief above mentioned, for the appointment of receivers to collect the judgment against members of the selling syndicate and to pay over the sums collected to the bondholders; for the vacation of the previous temporary restraints to the extent that they were inconsistent with or unnecessary for the enforcement of the judgment; that the judgment against Fitzgerald & Co. "shall be valid and enforceable to the extent that it is collectable out of its assets and property within the jurisdiction of this Court"; and that Walter D. Van Riper, originally one of the plaintiffs and subsequently counsel for the plaintiffs, be allowed a fee of $50,000, to be paid by the

receivers out of money in their hands, for his services rendered as counsel from February 5, 1949.

All defendants, with the exception of the Sarjem Corporation and Sherritt, petitioned this court for certification to review the judgment of the Chancery Division of the Superior Court and we granted their petition.

## II.

The facts as herein summarized clearly prove that the acquisition of the bridges by the bridge commission was fraught with fraud and 'corruption, and the lengthy record which we have reviewed page by page and from which this statement of the facts has been condensed demonstrates even more conclusively the viciousness of the transaction. We are in complete accord with the determination of the trial court that the purchase of the bridges was accomplished in a manner plainly contrary to public policy and therefore illegally.

The members of the board of chosen freeholders and of the bridge commission are public officers holding positions of public trust. They stand in a fiduciary relationship to the people whom they have been elected or appointed to serve. *Rankin v. Board of Education,* 135 *N. J. L.* 299, 303 (*E. & A.* 1947); *Trist (Burke) v. Child,* 88 *U. S.* 441, 450, 22 *L. Ed.* 623, 625 (1875); *Edwards v. City of Goldsboro,* 141 *N. C.* 60, 53 *S. E.* 652, 653 (*Sup.* 1906); *Tuscan v. Smith,* 130 *Me.* 36, 153 *A.* 289, 294 (*Sup. Jud.* 1931); *State v. Naumann,* 213 *Iowa* 408; 239 *N. W.* 93, 99 (*Sup.* 1931); *In re Marshall,* 363 *Pa.* 326, 69 *A.* 2d 619, 625 (*Sup.* 1949); 42 *Am. Jur., Public Officers,* § 8, *p.* 885; 43 *Id.* § 260, *p.* 77-78; 67 *C. J. S., Officers,* § 6, *p.* 118. As fiduciaries and trustees of the public weal they are under an inescapable obligation to serve the public with the highest fidelity. In discharging the duties of their office they are required to display such intelligence and skill as they are capable of, to be diligent

and conscientious, to exercise their discretion not arbitrarily but reasonably, and above all to display good faith, honesty and integrity. *City of Newark v. N. J. Turnpike Authority,* 7 *N. J.* 377, 381–382 (1951) ; *Ryan v. Paterson,* 66 *N. J. L.* 533, 535–536 *(Sup. Ct.* 1901) ; *Schefbauer v. Kearney,* 57 *N. J. L.* 588, 601 *(Sup. Ct.* 1895) ; *Ames v. Montclair,* 97 *N. J. Eq.* 60, 65 *(Ch. 1925)* ; *United States v. Thomas,* 82 *U. S.* 337, 342, 21 *L. Ed.* 89, 91 (1873) ; *Paschall v. Passmore,* 15 *Pa.* 295, 304 *(Sup.* 1850) ; *Cumberland County v. Pennell,* 69 *Me.* 357, 365, 31 *Am. Rep.* 284 *(Sup. Jud.* 1879) ; *Speyer v. School Dist. No.* 1, 82 *Colo.* 534, 261 *P.* 859, 860 *(Sup.* 1927) ; 43 *Am. Jur., Public Officers,* §§ 260–261, *p.* 77–78; 43 *Id.* § 267, *p.* 82; 67 *C. J. S., Officers,* § 114, *p.* 402. They must be impervious to corrupting influences and they must transact their business frankly and openly in the light of public scrutiny so that the public may know and be able to judge them and their work fairly. When public officials do not so conduct themselves and discharge their duties, their actions are inimicable to and inconsistent with the public interest, and not only are they individually deserving of censure and reproach but the transactions which they have entered into are contrary to public policy, illegal and should be set aside to the fullest extent possible consistent with protecting the rights of innocent parties. *Brooks v. Cooper,* 50 *N. J. Eq.* 761 *(E. & A.* 1893) ; *Cameron v. International, &c., Union No.* 384, 118 *N. J. Eq.* 11 *(E. & A.* 1935) ; *Girard Trust Co. v. Schmitz,* 129 *N. J. Eq.* 444 *(Ch.* 1941) ; *Allen v. Commercial Casualty Insurance Co.,* 131 *N. J. L.* 475, 477–478 *(E. & A.* 1944) ; *Stone v. William Steinen Mfg. Co.,* 133 *N. J. L.* 593, 595 *(E. & A.* 1946) ; *Pan American Petroleum & Transport Co. v. United States,* 273 *U. S.* 456, 500, 71 *L. Ed.* 734, 745 (1927) ; *Mammoth Oil Co. v. United States,* 275 *U. S.* 13, 72 *L. Ed.* 137 (1927) ; *Edwards v. City of Goldsboro, supra,* 141 *N. C.* 60, 53 *S. E.* 625 *(Sup.* 1906) ; *Tuscan v. Smith, supra,* 130 *Me.* 36, 153 *A.* 289 *(Sup. Jud.* 1931) ; 43 *Am. Jur., Public Officers,* § 291, *p.* 101.

These obligations are not mere theoretical concepts or idealistic abstractions of no practical force and effect; they are obligations imposed by the common law on public officers and assumed by them as a matter of law upon their entering public office. The enforcement of these obligations is essential to the soundness and efficiency of our government, which exists for the benefit of the people who are its sovereign. *Constitution of* 1947, *art. I, par.* 2. The citizen is not at the mercy of his servants holding positions of public trust, nor is he helpless to secure relief from their machinations except through the medium of the ballot, the pressure of public opinion or criminal prosecution. He may secure relief in the civil courts either through an action brought in his own name, *Tube Reducing Corp. v. Unemployment Compensation Commission,* 1 *N. J.* 177, 181 (1948) ; *Waszen v. City of Atlantic City,* 1 *N. J.* 272, 276 (1949) ; *Haines v. Burlington County Bridge Commission,* 1 *N. J. Super.* 163, 170–173 (*App. Div.* 1949), or through proceedings instituted on his behalf by the Governor, *Constitution of* 1947, *art. V, sec. I, par.* 11, or by the Attorney-General, *Public Service Coordinated Transport v. State,* 5 *N. J.* 196, 207–209 (1950). Under the former practice the great prerogative writs, especially *certiorari,* were generally available to the aggrieved citizen, but by *art. VI, sec. V, par.* 4 of the *Constitution of* 1947 the relief theretofore granted in such matters as a matter of judicial discretion became a matter of right, see *Ward v. Keenan,* 3 *N. J.* 298, 303–309 (1949). Nonfeasance, misfeasance, malfeasance and corruption in public office cannot prevail against an aroused citizenry who have it in their power to end the misconception of some public officials that their obligations are fully met so long as they obey the letter of the law and avoid its penal sanctions. That the shortcomings of some public officers may not make them accountable in our criminal courts does not mean that their nefarious acts cannot successfully be attacked through the processes of the civil law.

In order to hold the transaction here involved against public policy and therefore illegal, it is not necessary that there be a showing that the statutory procedure for the creation of a bridge commission and the purchase by it of bridges was not technically followed. Neither is it necessary that there be a showing that the purchase was in fact unwise and unprofitable. Ordinarily it is not the judicial function to pass upon the wisdom or the profitableness of such transactions, that being under most circumstances the legitimate function of the public bodies to which such matters have been delegated by the Legislature, *Schefbauer v. Kearney, supra,* 57 *N. J. L.* 588, 601 (*Sup. Ct.* 1895); *Ryan v. Paterson, supra,* 66 *N. J. L.* 533, 535 (*Sup. Ct.* 1901). It is the potential for evil and not the actual financial loss or other injury incurred that renders a transaction illegal because of an abuse of discretion, *Attorney-General v. Firemen's Insurance Co.,* 74 *N. J. Eq.* 372 (*E. & A.* 1909); *Cameron v. International, &c., Union No.* 384, *supra,* 118 *N. J. Eq.* 11, 30 (*E. & A.* 1935); *Edwards v. City of Goldsboro, supra,* 141 *N. C.* 60, 53 *S. E.* 652, 655 (*Sup.* 1906). It is sufficient, therefore, that it be proven that the board of chosen freeholders and the bridge commission which it created abnegated their positions of public trust and the duties imposed upon them by law by failing to exercise their discretion in good faith and on fair and intelligent consideration free from corrupting influences. On the facts here presented there can be no doubt but that both the freeholders and the bridge commissioners were delinquent in these respects. Their docility and malleability in the hands of Powell and his associates in the selling syndicate, the absence of independent consideration and investigation of a very complicated transaction involving voluminous technical documents, and the unprecedented speed and secrecy with which the purchase was effected are ample evidence of a palpable abuse of discretion and breach of trust. The conduct of the members of the board of chosen freeholders and of the bridge commission constituted a fraud on the statutes empowering them to act.

The transaction was that of the county and the bridge commission in form only.

It is urged on us that speed and secrecy in the purchase of the bridges was necessary and salutary and that there is no statutory requirement that bridges be purchased on notice to the public. Indeed, it is even argued that *R. S.* 27:19–35 expressly provides that there need be no notice. There is no merit to these contentions. We cannot subscribe to the philosophy of Wood, the selling syndicate's attorney, that the idea of "open covenants openly arrived at" is merely an impractical theory. Moreover, *R. S.* 27:19–35 does not have the connotation which the defendants would attribute to it. That statute deals with the advertisement for bids and the award of contracts on bridges. It specifies that contracts in excess of $2,500 for the construction, repair or maintenance of bridges shall be awarded by a bridge commission to the lowest responsible bidder following advertisement for bids. Then follows the provision that "Contracts for the purchase of bridges may be made and executed without advertisement." This, the defendants claim, constitutes a declaration of "legislative policy with regard to secrecy applicable to the very type of transaction in question." This claim is a patent perversion of the plain language of the statute. The statute quite obviously is not a legislative sanction of secrecy. It is merely an exception to the requirement that substantial contracts be let after advertisement to the lowest bidder, a necessary exception, moreover, for if an existing bridge is to be purchased it can only be purchased from its owner and an advertisement for bids would be a futile gesture. There is nothing in the statute from which it can be inferred that the Legislature was authorizing or approving clandestine and precipitous transactions.

The position of the members of the selling syndicate is equally culpable if not more so than that of the freeholders and the bridge commissioners whom they manipulated. The citizen is not without obligation to his government and to its officers. Just as a public officer owes a fiduciary

duty to the public, so every member of the public owes a correlative duty to the officer and the government he represents. This responsibility, unfortunately too infrequently lived up to, is to deal fairly and frankly with public officials and to refrain from exerting improper pressures or prostituting personal influence or prestige. We need not dwell on the dangers inherent in ignoring this obligation of the citizen. Suffice it here to quote from the opinion of the United States Supreme Court in *Trist (Burke) v. Child, supra,* 88 *U. S.* 441, 450, 22 *L. Ed.* 623, 625 (1875) :

"The foundation of a republic is the virtue of its citizens. They are at once sovereigns and subjects. As the foundation is undermined, the structure is weakened. When it is destroyed the fabric must fall. Such is the voice of universal history. * * * The theory of our government is, that all public stations are trusts, and that those clothed with them are to be animated in the discharge of their duties solely by considerations of right, justice and the public good. They are never to descend to a lower plane. But there is a correlative duty resting upon the citizen. In his intercourse with those in authority, whether executive or legislative, touching the performance of their functions, he is bound to exhibit truth, frankness and integrity. Any departure from the line of rectitude in such cases is not only bad in morals but involves a public wrong."

See also *Hume v. United States,* 132 *U. S.* 406, 414, 33 *L. Ed.* 393, 397 (1889). One cannot read the record in the instant case fairly without being forced to the conclusion that the members of the selling syndicate through the medium of their political influence or professional prestige knowingly and intentionally for their private profit and without regard to their obligations as citizens induced the chosen freeholders and the bridge commissioners to violate their public trust by blindly agreeing to the syndicate's proposal.

In view of the fact that the transaction giving rise to the issuance of the $12,400,000 of revenue bonds was contrary to public policy, and so illegal and therefore voidable, the question next arises as to the rights of the participants in the bond syndicate who are the owners of the bonds and of the Chemical Bank which holds them as pledgee. It is clear

that the syndicate participants, having purchased the bonds, are holders for value, *R. S.* 7:2–26, and that the Chemical Bank is a holder for value to the extent of its loan to the bond syndicate, *R. S.* 7:2–27. The pertinent inquiry, therefore, is whether or not the various participants and the bank, being holders for value, are also holders in due course so as to bring them within the protection of the Negotiable Instruments Law, *R. S.* 7:2–51 to 59.

To qualify as a holder in due course, *R. S.* 7:2–52 requires, among other things, that a holder take an instrument "in good faith and for value" and "That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." *R. S.* 7:2–59 provides that "every holder is deemed *prima facie* to be a holder in due course" and *R. S.* 7:2–56 provides that "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of * * * such facts that his action in taking the instrument amounted to bad faith." In interpreting this last section of the Negotiable Instruments Law, our courts have consistently adhered to and frequently quoted the rule expressed in *Rice v. Barrington,* 75 *N. J. L.* 806, 807 (*E. & A.* 1908):

"* * * proof of circumstances calculated merely to arouse suspicion will not defeat recovery on a negotiable note taken for value before maturity. Bad faith, *i. e.,* fraud, not merely suspicious circumstances, must be brought home to a holder for value whose rights accrued before maturity, in order to defeat his recovery on a negotiable note upon the ground of fraud in its inception or between the parties to it."

For other decisions of our former court of last resort to the same effect see *National Bank of Republic v. Young,* 41 *N. J. Eq.* 531 (*E. & A.* 1886); *Aldrich v. Peckham,* 74 *N. J. L.* 711 (*E. & A.* 1907); *Davis v. Clark,* 85 *N. J. L.* 696 (*E. & A.* 1914); *Hudson County, &c., Bank v. Alexander Furs, Inc.,* 133 *N. J. L.* 256 (*E. & A.* 1945). Municipal

securities such as those here involved are on the same footing as other negotiable paper coming within the purview of the Negotiable Instruments Law, *Borough of Montvale v. People's Bank*, 74 *N. J. L.* 464 (*E. & A.* 1907); *Linbarger v. Board of Education*, 83 *N. J. L.* 446 (*E. & A.* 1912); 15 *McQuillin, Municipal Corporations* (3*d* ed. 1950), § 43.69.

Applying these statutory provisions as interpreted by our courts to the facts here before us it at once appears that the firm of Ketcham and Nongard by virtue of their role as a member of the selling syndicate cannot qualify as holders in due course. They not only had knowledge of but actively participated in the illegal transaction which resulted in the issuance of the bonds. They are, therefore, not entitled to the protection afforded by the Negotiable Instruments Law. However, since Ketcham and Nongard were bound to purchase the entire bond issue from the bridge commission and in fact did actually purchase one-half of the entire issue, their interest was contrary to the interest of the other participants in the bond syndicate to whom they transferred for value the bulk of their holdings. Because of this conflict of interest and because the bond syndicate participants if acting on their own behalf would not have acquired the knowledge had by Ketcham and Nongard, it is well established that their knowledge of the fraud in the issuance of the bonds cannot be imputed either on the theory of agency or of partnership to the other participants in the bond syndicate or to the bank. "Common experience condemns any such presumption" of disclosure, *Bridgeton National Bank v. Hepner*, 104 *N. J. L.* 7, 9 (*Sup. Ct.* 1928); *Sooy v. State*, 41 *N. J. L.* 394 (*E. & A.* 1879); *Graham v. Orange County National Bank*, 59 *N. J. L.* 225 (*E. & A.* 1896); *Vulcan Detinning Co. v. American Can Co.*, 72 *N. J. Eq.* 387 (*E. & A.* 1907); *Hanford v. Duchastel*, 87 *N. J. L.* 205 (*E. & A.* 1915); *American Surety Co. v. Conway*, 88 *N. J. Eq.* 370 (*E. & A.* 1917); *Borough of Deal v. Sieling*, 102 *N. J. L.* 585 (*E. & A.* 1926); 2 *Am. Jur., Agency*, § 379, *p.* 298.

The status of the Chemical Bank, of B. J. Van Ingen & Co. and of the other participants in the bond syndicate is not so clear. For some time prior to the issuance of the bonds, the bank and B. J. Van Ingen & Co. had negotiated with Ketcham and Nongard and others representing the selling syndicate. They were aware that the bridge commission was not created until the very day the bonds were issued, the day of the closing at the bank. They were familiar with the Caldwell-Mitchell opinion which called attention to the dangers inherent in the virtually simultaneous creation of the bridge commission, the purchase by it of the bridges and the issuance by it of the bonds. The senior officer of the bank present at the closing had his doubts as to whether the freeholders and the bridge commissioners had been adequately informed of the transaction. B. J. Van Ingen & Co., moreover, was aware of the fact that the State of New Jersey was considering the acquisition of the bridges by condemnation at a price fixed by a statutory formula substantially below that at which the bridges were to be purchased by the bridge commission. In the face of these facts, and although prior to the closing on October 22, 1948, they had never had any contact with the officials in Burlington County who were to be responsible for the acquisition of the bridges and the issuance of the bonds, B. J. Van Ingen & Co. and the Chemical Bank were content merely to assume that the appropriate officials of the county had full knowledge of and had actively participated in the arrangements. They apparently considered it sufficient to rely upon the assurances of the representatives of the selling syndicate to the effect that the transaction was legal and proper in all respects. In the circumstances here present their conduct might well be considered negligent. But under the law as previously summarized suspicion does not constitute knowledge, there is no duty to make inquiry, and even assuming that the plaintiff was negligent such negligence did not amount to fraud, *Aldrich v. Peckham, supra,* 74 *N. J. L.* 711, 717 (*E. & A.* 1907). There being a lack of proof that the fraud surround-

ing the issuance of the bonds was brought home to the Chemical Bank and B. J. Van Ingen & Co. before they parted with value on the strength of the validity of the bonds, we are reluctantly driven to the conclusion that they are holders thereof in due course.

The other participants in the bond syndicate likewise qualify as holders in due course. They had no part in the negotiations leading up to the acquisition of the bridges, were not represented at the closing at the Chemical Bank on October 22, and had no knowledge of the transaction or the issuance of the bonds until Van Ingen got in touch with them on October 25 and invited them to join the syndicate for the disposal of the bonds to the public. Their suspicions as to the legality of the issuance of the bonds should most certainly have been aroused, however, despite the unqualified opinion of Wood as to the validity of the bonds, by the knowledge that the formal phases of the transaction occurred on a single day, by their reading in the newspapers that the Governor was about to commence an investigation into the acquisition of the bridges and was going to make it impossible to market the bonds, and by the mysterious telegram relating to the issuance of the bonds which was received by one of their number from an official of the State. It would appear that they relied too heavily upon the representations of the members and representatives of the selling syndicate which had engineered the entire transaction with such stealth and finesse. But, as we have previously indicated, "proof of circumstances calculated merely to arouse suspicion will not defeat recovery on a negotiable note taken for value before maturity," *Rice v. Barrington, supra,* 75 *N. J. L.* 806. 807 (*E. & A.* 1908), and "mere notice of facts, such as would have put a prudent person upon inquiry, is not sufficient to impeach the title of the holder of negotiable paper taken for value before maturity," *National Bank of Republic v. Young, supra,* 41 *N. J. Eq.* 531, 538 (*E. & A.* 1886).

The firmly established rule in this State that requires us in the circumstances here present to hold all of the bond-

holders except Ketcham and Nongard to be holders in due course is based on sound reasoning. Negotiable securities are frequently if not generally sold and transferred at places far removed from the scene of the transactions which gave rise to their issuance. In most instances it would be impossible or at least impractical in the ordinary course of business for the purchaser of securities to make the investigation necessary to allay any suspicions he might have. To require an investigation in such cases before affording the purchaser protection as a holder in due course would reduce the usefulness and value of negotiable paper and tend unduly to impede the transaction of business in a workaday world. Credit, moreover, is a fickle thing; it can be easily and quickly ruined but it may take years to restore it. Exceptions to the general rule should not be made in particular cases, for to do so "would go far towards destroying the market value of municipal securities," *Bernards Township v. Morrison,* 133 *U. S.* 523, 529, 33 *L. Ed.* 726, 730 (1890).

As holders in due course the Chemical Bank, B. J. Van Ingen & Co., and the other members of the bond syndicate with the exception of Ketcham and Nongard are entitled by both the law merchant and the Negotiable Instruments Law to enforce the bonds according to their tenor. *R. S.* 7:2–57 provides that "a holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon." Under the mandate of this statute, which codifies the common law on the subject, and by the applicable decisions of our courts it is settled that want of power to issue bonds is the only defense that is available to a municipal corporation after it has put on the market bonds purporting to be issued with due formality and after they have passed into the hands of innocent holders for value. Negotiable municipal bonds are enforceable in the hands of a holder in due course, even though the bonds were wrongfully disposed of by public

officials without the issuing body receiving any consideration therefor and "notwithstanding irregularity, fraud or misconduct on the part of the officers or agents of the corporation," *Copper v. Mayor and Council of Jersey City*, 44 *N. J. L.* 634, 635 (*E. & A.* 1882) ; *Borough of Montvale v. People's Bank, supra*, 74 *N. J. L.* 464 (*E. & A.* 1907) ; *Linbarger v. Board of Education, supra*, 83 *N. J. L.* 446 (*E. & A.* 1912). See also *Mercer County v. Hacket*, 68 *U. S.* 83, 17 *L. Ed.* 548 (1864) ; *Cromwell v. County of Sac*, 96 *U. S.* 51, 24 *L. Ed.* 681 (1878) ; *City of Cairo v. Zane*, 149 *U. S.* 122, 37 *L. Ed.* 673 (1893) ; *Anderson County Commissioners v. Beal*, 113 *U. S.* 227, 28 *L. Ed.* 966 (1885) ; 15 *McQuillin, Municipal Corporations* (3d ed., 1950), §§ 43.91, 43.93, 43.95. The rule is not peculiar to municipal obligations. Our courts have applied the same principles in dealing with commercial securities and have held that the fact that a negotiable instrument is rooted in an illegal transaction or stems from a transaction prohibited by statute or contrary to public policy is no reason for refusing to enforce the instrument in the hands of a holder in due course, *Modern Industrial Bank v. Taub*, 134 *N. J. L.* 260 (*E. & A.* 1946).

The holders of the bonds also contend that they are entitled to protection by virtue of their reliance on certain recitals and representations appearing on the face of the bonds. Since the bridge commission is authorized by *R. S.* 27:19–26 *et seq.*, as amended by chapter 318 of the Laws of 1946, to determine the existence of the facts and conditions prerequisite to the issuance of the bonds, it is argued that its recitals are conclusive as to all such matters and that the plaintiffs are estopped from asserting against the holders any defect in connection with the issuance of the bonds. The doctrine of estoppel by recital is uniformly recognized by the decisions of the courts of this State and of the United States. The doctrine is rooted in the essential need for assuring the marketability of municipal securities coupled with the recognition by the courts that those who purchase these securities in good faith and for value and who rely on

the truth of the recitals should not be required to bear the loss if the recitals prove false, *Mutual Benefit Life Insurance Co. v. City of Elizabeth,* 42 *N. J. L.* 235 (*Sup. Ct.* 1880) ; *Singer Manufacturing Co. v. City of Elizabeth,* 42 *N. J. L.* 249 (*Sup. Ct.* 1880) ; *Cotton v. New Providence,* 47 *N. J. L.* 401 (*Sup. Ct.* 1885) ; *Knox County v. Aspinwall,* 62 *U. S.* 539, 16 *L. Ed.* 208 (1859) ; *Mercer County v. Hacket, supra,* 68 *U. S.* 83, 17 *L. Ed.* 548 (1864) ; *Town of Coloma v. Eaves,* 92 *U. S.* 484, 23 *L. Ed.* 579 (1876) ; *Anderson County Commissioners v. Beal, supra,* 113 *U. S.* 227, 28 *L. Ed.* 966 (1885) ; *Bernards Township v. Morrison, supra,* 133 *U. S.* 523, 33 *L. Ed.* 726 (1890) ; *City of Evansville v. Dennett,* 161 *U. S.* 434, 40 *L. Ed.* 760 (1896) ; 15 *McQuillin, Municipal Corporations* (*3d ed.* 1950), §§ 43.97–43.116; *Anno.* (1933) 86 *A. L. R.* 1057, supplemented (1945) 158 *A. L. R.* 938. Without the protection of the doctrine of estoppel by recital the market for municipal bonds would be greatly limited. As was stated in *Municipal Trust Co. v. Johnson City,* 116 *Fed.* 458, 467 (*C. C. A.* 6, 1902), *cert.* denied, 194 *U. S.* 636, 48 *L. Ed.* 1161 (1904) : "If they were to go out branded with the stigma of uncertainty with respect to the existence of conditions which the law puts upon their issue, but which the officers having charge of their issue declare do in fact exist, it must deeply affect the value of such paper and the price which municipalities must pay for the loan of money."

We are of the opinion, therefore, that the holders of the bonds, with the exception of Ketcham and Nongard, are entitled to the protection of the doctrine of estoppel by recital, although in the circumstances it would appear that the protection afforded them by the doctrine is merely cumulative to that afforded them as holders in due course by the Negotiable Instruments Law. As *bona fide* purchasers of the bonds for value they have the right to enforce them according to their terms and in equity their interest must override that of those attacking the transaction giving rise to the bonds, at least to the extent that the interests are conflicting. See *United States v. Stinson,* 197 *U. S.* 200, 205,

49 *L. Ed.* 724, 725 (1905) ; 3 *Pomeroy, Equity Jurisprudence* (*5th ed.* 1941), §§ 775, 777, 870, 918; 5 *Williston on Contracts* (*Rev. ed.* 1937), § 1531; *Restatement, Restitution* (1937), § 172.

Another important issue presented to us relates to the power of the State to acquire these two bridges by condemnation. At the time the bridges were constructed there existed two procedures whereby the State could acquire them by condemnation at a price fixed by a statutory formula. The first method was provided by *R. S.* 48:5–22. It required the State of New Jersey to act in conjunction with the State of Pennsylvania or a subdivision thereof and could be pursued only at or after five years from the date of completion. By chapter 401 of the Laws of 1947 the State gave up its right to acquire bridges under this method in the event they came into the ownership of a public body. Moreover, by chapter 318 of the Laws of 1946 amending the Self-Liquidating Bridge Act the State covenanted that it would not "in any manner impair, alter or abrogate" any of the obligations of a bridge commission to the holders of its bonds. Therefore, although the necessary compacts between New Jersey and Pennsylvania have been entered into pursuant to appropriate enabling legislation in the two states and are now before Congress awaiting its approval, it would appear that any condemnation of the bridges pursuant to the method provided by *R. S.* 48:5–22 is precluded if the title to the bridges is left in the bridge commission. We are not unmindful of the fact that in their amended complaint the plaintiffs prayed for a declaration as to the constitutionality of chapter 401 of the Laws of 1947, but the point has not been raised, briefed or argued on these appeals and so we assume that it has been abandoned and we therefore decline to pass upon it.

The second method for the acquisition of the bridges pursuant to a statutory formula is to be found in section 4 of each of the special federal acts authorizing their construction, which section is set forth at length in our

statement of the facts. It is therein provided that "After the date of completion of such bridge, as determined by the Secretary of War, either the State of New Jersey, the State of Pennsylvania, any political subdivision of either of such States * * * or any two or more of them jointly" may acquire the bridges "by purchase, or by condemnation in accordance with the law of either of such States governing the acquisition of private property for public purposes by condemnation." The section then provides a formula for limiting the price of acquisition by condemnation if it is so acquired after the expiration of 20 years from the date of completion. While the Secretary of War evidently has never certified the date of their completion, it appears from the report of Coverdale and Colpitts that the 20-year period expired on August 15, 1949, as to the Tacony-Palmyra Bridge and on May 1, 1951, as to the Burlington-Bristol Bridge. Therefore, on October 22, 1948, when the Burlington County Bridge Commission took title to the two bridges by purchase, 20 years had not expired from the date of their completion. In our opinion, however, the bridges are not now subject to condemnation under the federal formula, if they remain in the hands of the bridge commission. The federal acts authorizing the construction of the bridges gave an equal right of acquisition, either by purchase or after 20 years by condemnation, to the States of New Jersey and Pennsylvania and to their political subdivisions. The acts obviously do not contemplate that once the bridges have been acquired by one of the parties named therein they may subsequently be acquired by condemnation by another of the parties so named. The State of New Jersey may no more condemn the bridges under the provisions of the federal acts once the title to them has vested in the bridge commission than it could take them by condemnation from the State of Pennsylvania if it had been the first to acquire them. This interpretation of these acts is supported by the fact that they refer only to the condemnation "of private property for public purposes" and not to the condemnation of public

property for other public purposes. Moreover, section 5 of each of the federal acts provides that tolls to amortize the amount paid for the bridges by any one of the public bodies authorized to take may not be charged for more than 30 years from the date of acquisition. It certainly was not intended that the period during which tolls could be charged might be indefinitely extended by one public body acquiring the bridges from another. The plaintiffs contend that the bridges may be acquired by the State from the bridge commission on the theory of the supremacy of the sovereign. The fallacy in this contention is that the theory of the supremacy of the sovereign is inapplicable when it comes to the right of the State to acquire the bridges under the provisions of particular federal acts. Its rights under these federal acts arise not by virtue of its sovereign status but because it has been designated in them as one of the parties entitled to acquire the bridges. The State's status and ability to condemn under the federal acts is therefore dependent upon the acts themselves, which give it a standing no higher than that enjoyed by the other parties designated therein.

We are accordingly of the opinion that the State may not condemn the bridges while they are owned by the bridge commission either under *R. S.* 48:5–22 or under the special federal acts authorizing the construction of the bridges. If the purchase of the bridges by the bridge commission is rescinded and the bridges are returned to private ownership, the right of the State to condemn the bridges at the state or federal formula price would, of course, be restored, since chapter 401 of the Laws of 1947 would then be inapplicable. In the event of such a rescission and condemnation, however, the covenants set forth in chapter 318 of the Laws of 1946 would necessitate the State making adequate provisions for the holders in due course of the bonds issued by the bridge commission.

Next to be considered is the question of the right of a bridge commission to operate at a profit, and more

specifically the right of the Burlington County Bridge Commission to operate for profit the two interstate bridges here involved. A bridge commission is a body both corporate and politic. Its creation by the board of chosen freeholders of a county is authorized by the "Self-Liquidating Bridges Act," *R. S.* 27:19–26 *et seq.,* as amended. In many respects it has a standing analogous to that of a municipal corporation and derives its power and authority to act solely from statute, *cf. City of Newark v. New Jersey Turnpike Authority,* 7 *N. J.* 377, 381 (1951). Like a municipal corporation it enjoys a considerable degree of discretion as to the manner in which it carries out the functions committed to it, but unlike "municipal corporations formed for local government" which by *art. IV, sec. VII, par.* 11 of the *Constitution of* 1947 are entitled to have statutes concerning them "liberally construed in their favor," the statutory powers of a bridge commission are to be strictly construed and any doubt or ambiguity is to be resolved against it. An examination of the various statutes pertaining to bridge commissions fails to disclose any provision from which it can reasonably be inferred that they have the power to operate bridges for profit. Rather, from the fact that the powers of bridge commissions are spelled out in some detail in the statutes without mention of the right to make a profit and also from the fact that the entire statutory scheme is designed towards making the bridges "self-liquidating," it clearly was not the legislative intent to give bridge commissions such power. For example, *N. J. S. A.* 27:19–32 pertaining in part to the rate of tolls, specifically states that:

"The rate of tolls to be charged for the use of any bridge constructed or purchased under the provisions of this article shall be so fixed and adjusted as to comply with any contract or agreement of the commission relative thereto and, in any event provide a fund sufficient to pay the interest and principal of any bonds issued under this title, and to provide an additional fund to pay the cost of maintaining, repairing and operating such bridges."

No mention whatever is made of providing a profit for the enrichment of a county. Moreover, in view of the fact that

a bridge commission is empowered by *N. J. S. A.* 27:19–28 to acquire intercounty and interstate bridges, it would be unjust to infer that one county could profit at the expense of, and out of property located in part in another county or state. It is not necessary for us to interpret the provision in section 5 of the two federal acts authorizing the construction of these bridges to the effect that tolls may be charged "to pay an adequate return on the cost thereof." Quite obviously the Federal Government cannot grant a power to an agency of the State which the State itself has not seen fit to grant. Even an interpretation of the federal acts most favorable to the defendant county would only permit the State to authorize the making of a profit from the operation of the bridges. It is therefore apparent not only that the bridge commission had no authority to make a profit but that the selling syndicate in representing to the freeholders and the prospective bridge commissioners that the county would realize a profit of over $4,000,000 on the operation of the bridges was doing so without any foundation in law for the statements.

Likewise without regard to law were the contemplated payments by the bridge commission in lieu of taxes to the municipalities of Burlington and Palmyra. *N. J. S. A.* 27:19–33 specifically states that the property of a bridge commission "shall be exempt from all taxes and special assessments by the State or any subdivision thereof * * *." We recognize that the acquisition of the bridges in question from private owners necessarily resulted in a substantial loss of ratables to the New Jersey communities in which the bridges are located, but this loss is no justification in law for permitting payments to them in lieu of taxes. The making of such payments by the bridge commission in the absence of statutory authorization would constitute an unlawful diversion of toll revenues, for as previously pointed out the powers of a bridge commission are derived wholly from statute. Therefore, contrary to the representations of the selling syndicate and although the contract of the bridge commission with the bondholders would permit it, we are of

the opinion that there is no warrant in law for the making of such payments in lieu of taxes and that they cannot lawfully be made.

Another question is presented by the contention of the defendant Fitzgerald & Co., one of the stockholders of the Burlington-Bristol Bridge Company at the time of its purchase by the bridge commission, that the court below never acquired jurisdiction over its person. Fitzgerald & Co. is a Delaware corporation. It was never served with process in New Jersey, but service was made upon it by registered mail addressed to it at its New York office and by service of its president there by a person who signed himself as sheriff of the City of New York but whose credentials showed him to be sheriff of the County of New York. It also appears that the summons mistakenly limited the defendant to answer within 20 days and that there was no affidavit of inquiry, no affidavit showing publication, and no order of the court providing for substituted service made or filed in the case. It likewise appears that the defendant Fitzgerald & Co. did not voluntarily appear and consent to the jurisdiction of the court, but rather both by its answer and by appropriate motion pursuant to *Rule* 3:12 sought to have the action as against it dismissed on the grounds of lack of jurisdiction over its person, insufficiency of process and insufficiency of service of process.

We are of the opinion that jurisdiction was never acquired over the person or the property of Fitzgerald & Co. through the failure of the plaintiffs to properly serve it. Clearly there can be no relief *in personam* against a defendant who has neither been served within the State nor consented to its jurisdiction, *Pennoyer v. Neff*, 95 *U. S.* 714, 24 *L. Ed.* 565 (1878); *Smith v. Colloty,* 69 *N. J. L.* 365 (*E. & A.* 1903); *Redzina v. Provident Institution, &c.*, 96 *N. J. Eq.* 346 (*E. & A.* 1924). To secure jurisdiction over a defendant "in an action affecting specific property, or any interest therein, or any *res* within the jurisdiction of the court," *Rule* 3:4–5 provides that if an affidavit be filed to the effect

that after diligent inquiry the defendant cannot be served within the State, service may be made and jurisdiction over the defendant's property acquired by personally serving the defendant in another state or by published notice and service by mail, each in the manner provided for by the rule, or as provided for by order of the court. The requirements of *Rule* 3:4–5 were not here complied with, for, as previously indicated, no affidavit of inquiry was filed, the record of personal service on the defendant in New York was defective on its face, no publication of notice was made and the court entered no order with respect to service. Moreover, the summons that was served on the defendant required it to answer within 20 days whereas according to *Rule* 3:12–1 it should have specified that 35 days was allowed for answering. The requirements of the rules with respect to service of process go to the jurisdiction of the court and must be strictly complied with. Any defects such as here present are fatal and leave the court without jurisdiction and its judgment void. There is nothing, however, to prevent a new action being instituted against Fitzgerald & Co. for the purpose of recovering from it $129,639.75, its *pro rata* share of the gross profits realized from the sale of the bridges, provided personal service can be had on it in this State, or for the purpose of recovering that portion thereof which is within this State in the event that only substituted service is made on it.

The final question of law presented is whether or not the plaintiffs are entitled to an allowance of counsel fees. The judgment below provided: "There is hereby awarded to Walter D. Van Riper, as counsel for the plaintiffs, the sum of $50,000 as counsel fees for services rendered in this cause commencing February 5, 1949, said sum to be paid by the Receivers out of the money in their hands when so directed by the Court."

There are sound reasons, however, weighing against the allowance of counsel fees to the plaintiffs. The plaintiffs' counsel as the then Attorney-General was himself

one of the parties to this action at the time of its commence-
ment.  Shortly thereafter his term of office as Attorney-
General expired, but he was retained as special counsel for
the purpose of representing the State in the cause.  Prior
to 1944 by virtue of *R. S.* 52:17-9 the Attorney-General was
empowered to appoint on request special counsel to represent
any state board, commission, body or official either in an
advisory capacity or in court proceedings, such counsel to be
compensated out of funds appropriated to the use of the
agency or official being represented.  In the reorganization
of the Department of Law by chapter 20 of the Laws of
1944 (*N. J. S. A.* 52:17A-1 to 20), *R. S.* 52:17-9 was
repealed.  Instead it was specifically provided that no depart-
ment, agency or official shall employ counsel to represent
or advise it or him, *N. J. S. A.* 52:17A-11, and that

"No special counsel shall be employed for the State or for or by
any officer, department, board, body, commission or instrumentality
of the State Government except by authority of the Attorney-General,
and then only with the approval of the Governor, and provided that
appropriations have been made therefor, unless the matter be of
such an emergency and shall be so declared by the Governor." *N. J.
S. A.* 52:17A-13.

It is apparent from the foregoing that the Legislature
contemplated that special counsel for the State, its agencies
or officers should be compensated out of funds appropriated
by it and not by the court in a particular proceeding in
which special counsel might be appearing.  While special
counsel appointed pursuant to *N. J. S. A.* 52:17A-13 is not
technically a member of the Department of Law, *N. J. S. A.*
52:17A-3, he is in fact appointed to carry out one of its
functions, *N. J. S. A.* 52:17A-4, and there appears no sound
reason why he should be permitted to receive and retain an
allowance of counsel fees by a court when the members of
the department while performing their official duties are
expressly forbidden to do so, both by statute, *N. J. S. A.*
52:17A-10, and by the Constitution, *art. VII, sec. I, par.* 3,
*Constitution of* 1947.  In the face of these provisions we

are not impressed by the plaintiffs' argument that the practice is to the contrary, for if that is the practice, it should be terminated, not perpetuated.

But even if there were no statutory obstacle to the allowance of counsel fees to the plaintiffs, none can be granted in this case because the allowance of fees is a matter of procedure governed by rule of court and there is here no "fund in court" or other basis within the provisions of *Rule* 3:54–7 warranting an allowance. In support of the power of the trial court to award counsel fees on the basis that there is a "fund in court" within the provisions of *Rule* 3:54–7(*b*), the plaintiffs rely upon four cases: *Cintas v. American Car and Foundry Co.,* 133 *N. J. Eq.* 301 (*Ch.* 1943), affirmed 135 *N. J. Eq.* 305 (*E. & A.* 1944), a stockholder's suit to restrain the payment of dividends to common stockholders out of moneys to which it was claimed the preferred stockholders had prior rights; *Katz v. Farber,* 4 *N. J.* 333 (1950), a dispute as to a wife's right of dower in certain real estate where the parties by consent had actually deposited moneys in court "subject to the rules of this court"; *Milberg v. Seaboard Trust Co.,* 7 *N. J.* 236 (1951), an action against trustees in liquidation in which the plaintiffs were designated as representatives of all the owners and holders of the outstanding trust certificates and shares of stock and in which the trustees actually paid into court over $300,000; and *Trustees v. Greenough,* 105 *U. S.* 527, 26 *L. Ed.* 1157 (1882), a suit to preserve the assets of a trust fund for the benefit of bondholders. The facts in the instant case, however, are not comparable to those in any of the cited cases and they do not constitute authority for the proposition that the court was here empowered to award counsel fees. This action was brought by the Governor and Attorney-General to rescind an illegal purchase made by a public body. It is not an action to create or preserve a fund for the benefit of a class of which the plaintiffs are representatives. The funds in the hands of the receivers are for the benefit of the defendant bondholders whom the plaintiffs quite obviously

do not represent. Nor does the fact that injunctive relief has been granted or that the proceeding is *quasi in rem* mean that there is a "fund in court." Such an interpretation of the term would constitute an unwarranted extension of *Rule* 3:54-7(*b*) and permit the award of counsel fees in a vast number of cases to which it was never intended that the rule should apply. Moreover, in a case where the power does not otherwise exist, the fact that a receiver is appointed for the purpose of effectuating the judgment of the court does not operate to authorize the allowance of fees to counsel for the parties as distinct from counsel to the receiver. It is our opinion, therefore, that there is no "fund in court" within the meaning of *Rule* 3:54-7(*b*) out of which an allowance of counsel fees may be made. Counsel is not without recourse to the Legislature which we have no doubt will on the matter being brought to its attention reimburse him for the services he has rendered on behalf of the public.

The plaintiffs also contend that the allowance of counsel fees by the trial court should not be disturbed since it was consented to by the defendants. This contention is not available for two reasons. First, the parties cannot by consent grant the court authority to do that which under the rules it is precluded from doing. Second, the consent is not by those who would ultimately bear the burden of paying such an allowance. Counsel for the members of the selling syndicate consented to the payment of the allowance out of funds in the hands of the receivers, but those funds are being held not for them but for the benefit of the holders of the bonds who have not consented to any such payment.

On the basis of the facts set forth herein, and of the law as discussed herein we are of the opinion: (1) By virtue of the wrongful conduct of the freeholders, the bridge commissioners and the members of the selling syndicate, the acquisition of the Burlington-Bristol Bridge and the Tacony-Palmyra Bridge by the bridge commission was effectuated in a manner contrary to public policy and is therefore illegal and voidable. (2) The Chemical Bank and all participants

in the bond syndicate with the exception of Ketcham and Nongard are holders in due course of the bridge commission revenue bonds, to the extent of their respective interests, and are entitled to enforce them according to their terms. (3) Unless the sale of the bridges is rescinded and they are returned to their former owner, the State has no right to acquire the bridges by condemnation under the procedure and at the price fixed by either the Delaware River Bridge Companies Act or by the special federal acts which authorized the construction of the bridges. (4) The bridge commission may not operate the bridges so as to result in a profit to Burlington County. (5) The bridge commission is precluded by law from making payments in lieu of taxes to the municipalities of Burlington and Palmyra. (6) The court failed to acquire jurisdiction over either the person or the property of Fitzgerald & Co. (7) An allowance of fees may not properly be made to counsel for the plaintiffs.

## III.

It is now necessary to determine what relief should be afforded in order to give effect to our findings and conclusions. Three alternatives suggest themselves. First, as was done by the trial court, the purchase of the bridges by the bridge commission might be rescinded and the bridges at once returned to private ownership. While this procedure is not without its merits, especially in rendering the bridges subject to condemnation by the State under statutory formula, we are precluded from adopting it because of the fact that it would substantially prejudice the rights of the holders in due course of the bonds of the bridge commission. These bonds as issued are a lien on the revenues of the two bridges. So long as these bridges remain in the hands of the bridge commission they and their revenues are tax-exempt, but if the bridges were restored to private ownership it would be beyond the power of the court to prevent property taxes and income taxes from diverting funds in substantial amounts

which would otherwise be payable to the bondholders. It is obvious, therefore, that a present rescission on any terms which we could impose would be inequitable to the bondholders, depriving them of protection to which they are entitled as holders in due course.

It has next been suggested that title to the bridges be left in the bridge commission until sufficient funds are available to retire the bonds, at which time the bridges could be returned to their former owners. Such a conditional or delayed rescission would protect the bondholders since the bridges would be left temporarily in a tax exempt status, but it would be inequitable to the toll-paying public. It would impose upon the public the burden of paying through tolls for the purchase of the bridges a price more than double that at which they could be acquired by condemnation and at the same time deprive the public of the benefit of the purchase by placing the bridges again in private ownership which would be free to continue to collect tolls. This would be contrary to the obvious intent of the Self-Liquidating Bridges Act, *R. S.* 27:19–26, *et seq.*, as amended, and of the federal acts that once acquired by a public body they are to become toll free as soon as the cost of their acquisition has been paid, except as provided in section 5 of each of the federal acts:

"After a sinking fund sufficient to pay the cost of acquiring the bridge and its approaches shall have been provided, such bridge shall thereafter be maintained and operated free of tolls, or the rates of toll shall thereafter be so adjusted as to provide a fund of not to exceed the amount necessary for the proper care, repair, maintenance, and operation of the bridge and its approaches."

To make the public pay an unnecessarily high price for these bridges and then by a delayed rescission to subject them to continued toll charges would be not only inequitable but contrary to the statutes: it would compound the injury already inflicted on the public.

The third alternative, which we conceive to be the most equitable and practical one in the circumstances,

is to leave the title to the bridges in the bridge commission subject to the supervision of the court so that its members will not again be able to violate their trust. The bridge commission will then be permitted to meet its obligations to the holders in due course of its bonds and the public will be assured of having the bridges toll free at the earliest possible date. Even this procedure has its inequities, for by leaving the title to the bridges in the bridge commission the public will have been deprived of its right under the state and federal statutory formulas to acquire the bridges at a substantially lower price. During the course of the trial of this action, however, the plaintiffs elected to proceed on the theory of rescission alone and waived their claim against the members of the selling syndicate for $7,400,000 in damages (the difference between the $12,400,000 of bonds issued and an estimated condemnation price of $5,000,000) which they had made in their amended complaint. This waiver was relied upon by the defendants in determining what witnesses to call in their defense and accordingly is binding on us as well as on the court below and prevents any assessment of damages based on the amended complaint against the selling syndicate. This waiver does not preclude us, however, from requiring the members of the selling syndicate over whom the court acquired jurisdiction to disgorge the profits which they received from this illegal transaction. Where rescission is prayed for and is warranted by the facts, but cannot be decreed because of the intervening equities of innocent third parties such as the bondholders here, under general principles of equity the court may require the wrongdoers to account for their profits so that as nearly as may be the parties will be protected and equity done, *Hartman v. Hartle,* 95 *N. J. Eq.* 123, 125 (*Ch.* 1923); *Attorney-General v. Linden Cemetery Ass'n.,* 85 *N. J. Eq.* 501, 506–507 (*E. & A.* 1916); 1 *Pomeroy, Equity Jurisprudence* (*5th ed.* 1941), § 237e; 2 *Restatement, Trusts* (1935), § 291. Moreover, where as here the wrongdoers have conspired together to reap a profit out of a fraudulent transac-

500

tion they are jointly and severally liable and it is not necessary even that they all be before the court in order to grant complete relief, see *Bigelow v. Old Dominion Copper, &c., Co.,* 74 *N. J. Eq.* 457, 498 (*Ch.* 1908). The members of the selling syndicate must make restitution of that which they have received, for otherwise they will be unjustly enriched by their fraud at the expense of the public. They and their nominees are therefore liable to repay the $3,050,-347 gross profit which they received for their stock as the result of this transaction and they are not entitled to any credit for the expenses incurred in effectuating the fraudulent scheme, for none of those expenses can rightly be said to have been of benefit to the bridge commission or the public it represents. Bell, Hanff, Ketcham, Nongard and Powell were the members of the selling syndicate who took an active part in consummating the sale and so we are of the opinion that they are the only ones who should be held both jointly and severally liable for the entire amount of the illegal profits. The remaining persons who as stockholders of the Burlington-Bristol Bridge Company shared in the profits are severally liable only for that which they each received. In the instant case the members of the selling syndicate cannot complain that complete rescission and restoration of the *status quo* cannot be made, for the circumstances which prevent such relief are entirely of their own making. They are hoist with their own petard.

To effectuate the conclusions here reached the judgment appealed from is modified, with costs of this appeal assessed against the members of the selling syndicate and their nominees jointly and severally, and the cause is remanded to the Chancery Division of the Superior Court for the entry of judgment in accordance with the following directions:

(1) The acquisition of the Burlington-Bristol Bridge and the Tacony-Palmyra Bridge by the Burlington County Bridge Commission on October 22, 1948, was accomplished in a manner contrary to public policy, and is illegal. It is therefore voided, but only to the extent hereinafter provided.

(2) The Chemical Bank and all participants in the bond syndicate, with the exception of Ketcham and Nongard, are holders in due course. As such holders, they and those claiming under them are entitled to enforce the bonds held by them to the extent of their interest therein and according to the terms thereof. Ketcham and Nongard as active participants in the illegal transaction are not holders in due course and the bonds held by them are null and void, except to the extent that the Chemical Bank has an interest therein as pledgee. In the event and to the extent that the Chemical Bank exercises its rights in the bonds as pledgee so that either principal or interest are paid thereon by the bridge commission, the bridge commission shall be subrogated to all the rights of the Chemical Bank against Ketcham and Nongard arising out of the note of the bond syndicate which the bonds were pledged to secure.

(3) The bridge commission shall retain title to the bridges together with all other property of whatever kind acquired by virtue of this transaction and it shall not retransfer or pay out any portion thereof to the sellers.

(4) To the extent that the members of the selling syndicate or their nominees have an interest therein, the entire transaction in all its ramifications is rescinded and they shall repay to the bridge commission the sum of $3,050,347 which represents the gross profit which they received from the sale of their stock in the Burlington-Bristol Bridge Company. The obligation to repay this sum shall be both joint and several as to Bell, Hanff, Ketcham, Nongard and Powell, but shall be several only as against the remaining sellers in the amounts they each received, specifically: Rowland H. Murray—$76,258.68; Thomas J. Christensen—$305,034.70; Irene E. Powell—$122,013.88; Paul A. Powell—$122,013.88; Mildred P. Meader—$122,013.88; Rickard W. Parks and Gladys A. Parks—$129,939.75. Judgment in the sums indicated, together with interest thereon from October 22, 1948, will accordingly be entered against these defendants and in favor of the bridge commission.

(5) The members of the selling syndicate and their nominees shall be given credit against the judgment entered against them (a) for the $50,000 paid by them by way of contribution and expense at the time of the acquisition by them of the Burlington-Bristol Bridge Company stock, and (b) for the excess of approximately $550,000 in the net current assets of the Burlington-Bristol Bridge Company at the time of its sale to the bridge commission which was to be returned to the sellers pursuant to the contract of sale. These sums shall be credited on the judgment against the sellers *pro rata* according to their holdings in the company at the time of the sale of its stock to the bridge commission. That portion of said sums which represents the *pro rata* share of Fitzgerald & Co. shall be paid into court by the bridge commission to be held for and paid to Fitzgerald & Co. upon claim made, provided prior thereto it shall not have become the subject matter of a new action against Fitzgerald & Co., in which event it shall be held and disposed of in accordance with the outcome of that action.

(6) The action shall be dismissed as against Fitzgerald & Co. for lack of jurisdiction.

(7) The receivers heretofore appointed shall be continued to collect the judgment against the members of the selling syndicate and their nominees and to pay over the sums heretofore collected or hereafter to be collected by them to the bridge commission on direction from the court. Said judgment shall not be cancelled of record in whole or in part except upon further order of the court. The receivers shall also enforce any rights of subrogation which may accrue to the bridge commission against Ketcham and Nongard as the result of the Chemical Bank exercising its rights as pledgee of the ·bonds, as herein elsewhere provided. They shall, moreover, promptly institute an action against Fitzgerald & Co. to recover its share of the gross profit from the sale of the stock in the Burlington-Bristol Bridge Com-

pany, making claim in this connection to the sums to be deposited in court under the provisions of paragraph (5) hereof.

(8) The bridge commission shall operate the bridges in strict compliance with all applicable statutes; it shall comply with all its obligations on those of its bonds held by holders in due course or those claiming under them; it shall not recognize any obligation on those of its bonds held by Ketcham and Nongard except to the extent that the Chemical Bank and those claiming under it have an interest therein; it shall recognize all its obligations on any and all contracts heretofore made by it, except those with members of the selling syndicate which contracts are declared null and void; and it shall not make any payments to any municipality in lieu of taxes.

(9) The court shall appoint a certified public accountant to make a quarterly audit and report to the court covering the operation of the bridges and the receipts and disbursements of the bridge commission. The court may require the bridge commission to make such other reports as may from time to time be deemed necessary.

(10) At such time as the obligations of the bridge commission on its bonds shall have been fully met the bridges shall either become toll free or tolls shall be charged to provide a fund not to exceed an amount necessary for the proper care, repair, maintenance and operation of the bridges and their approaches. All funds or other property now owned or hereafter acquired by the bridge commission shall be used solely for purposes related to the bridges. If on retirement of the bonds the bridge commission shall be succeeded by the board of chosen freeholders or other public body, its successor shall similarly be limited in the use of said funds or property.

(11) The bridges shall not be subject to condemnation or acquisition by the State or any other body or person so long as the bonds of the bridge commission remain outstanding, and thereafter tolls may not be charged by the bridge

commission or its successor except as provided in the preceding paragraph.

(12) No allowance of fees shall be made to counsel for the plaintiffs.

(13) The Chancery Division of the Superior Court shall retain jurisdiction over the cause for the purpose of making such further orders as may be necessary to enforce its judgment and for such further relief as may be necessary or appropriate.

*For modification*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*Opposed*—None.